**MONARCH ASSURANCE P.L.C.,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–518C.

United States Court of Federal Claims.

Aug. 15, 1996.

Raphael S. Moore, Sacramento, CA, for plaintiffs.

John C. Erickson, III, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Washington, DC, for defendant.

*ORDER*

ANDEWELT, Judge.

I.

In this action, plaintiffs, Monarch Assurance P.L.C. and Thomas Patrick Denton

Taylor, seek to recover from the Central Intelligence Agency (CIA) $35 million in breach of contract damages or, alternatively, $8 million for the taking of plaintiffs' property under the Fifth Amendment. According to the complaint, in exchange for $8 million paid by plaintiffs, an alleged CIA operative, John Patrick Savage, signed a promissory note on behalf of the CIA which provided for the payment of $35 million to plaintiffs by a certain date. Plaintiffs never received payment on the note and ultimately filed the instant suit. During discovery, defendant has sought to invoke the state secret privilege so as not to provide any information concerning the relationship, if any, between Savage and the CIA. For the reasons set forth below, defendant has adequately supported its claim of state secret privilege.

## II.

The pertinent facts, as alleged in the complaint, are as follows. Savage was an agent of the CIA. In 1989, Savage served as Deputy Director of the CIA's European Operations and in January 1990 became associated with the CIA's Global Affairs Division. During 1989 and 1990, Savage worked in Europe on two covert CIA projects code named "Ultima" and "Bluebook." Project "Ultima" was directed at making substantial funds available to certain foreign countries so as to enable those countries to fund projects beneficial to United States interests. Project "Bluebook" was directed at securing control of substantial funds in international banks over which an unnamed foreign country had made a competing claim.

Savage, assisted by a British solicitor, Charles J. Deacon, came to plaintiffs with what amounted to be a business proposition. The CIA needed money to support these covert projects but, for reasons not explained in the complaint, could not use its own funds directly. Through a series of negotiated fi-

nancial transactions, plaintiffs ultimately transferred to Savage and Deacon a total of $8 million ($5 million on October 31, 1989, and $3 million on April 17, 1990), and in return Savage issued a promissory note on April 26, 1990, obliging Savage to pay plaintiffs $35 million on or before April 30, 1990. The only issuer named on the promissory note was Savage; the note made no mention of the CIA, the United States, or any other third party.

After failing to receive payment on the promissory note, plaintiffs sued Deacon in the English courts and won a $35 million judgment. Plaintiffs, however, apparently were never able to collect on that judgment and filed the instant suit against the United States. The complaint contains three counts. As later defined by plaintiffs' counsel, Count I focuses on the promissory note and alleges that the United States breached an express contract with plaintiffs; Count II focuses on the negotiations that led to the promissory note and alleges a breach of an implied contract with plaintiffs; Count III rests on the takings provision of the Fifth Amendment. Plaintiffs contend in Count III that the CIA, through its representative Savage, appropriated $8 million from plaintiffs, put those funds to public use. in funding covert CIA activities, and then failed to provide plaintiffs just compensation for that appropriation as required by the Fifth Amendment.

## III.

Defendant initially responded to the complaint with a motion to dismiss or, in the alternative, for summary judgment. In the brief accompanying that motion, defendant presented a factual recitation, supported by affidavits and other evidence, suggesting that Savage was not a CIA agent but rather a con artist who had no connection at all with the CIA.[1] The factual recitation in defendant's

---

1. Defendant presented a declaration from a special agent for the Internal Revenue Service which states:

   For over a year, prior to his death in August of 1994, John Patrick Savage was the subject of a criminal investigation in this District, for which I was primarily responsible. Upon his death, that ·investigation was closed. Generally, the investigation involved suspected crimi-

nally fraudulent activities upon the part of Mr. Savage, wherein Mr. Savage wrongfully posed as a Government official affiliated with the Central Intelligence Agency. At the time of his death, an effort to seek an indictment against Mr. Savage was imminent.

Immediately prior to his death, I interviewed Mr. Savage, who expressly disavowed any affiliation with the Central Intelligence Agency.

motion also alleged that at the time of defendant's motion, British authorities were investigating plaintiff Taylor as a possible co-conspirator of Savage.

Although defendant presented a factual recitation that directly attacked plaintiffs' contention that Savage was a CIA agent, defendant's legal argument did not rely in any way on the correctness of this attack. Rather, in its motion, defendant contended that Savage's alleged relationship with the CIA was not relevant because under *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875), and subsequent decisions relying upon it, this court could not properly entertain a suit alleging a breach of contract involving secret CIA actions. To support this legal position, defendant presented an affidavit from John J. Devine, Associate Deputy Director for Operations of the CIA. Therein, Devine stated that national security would be adversely affected if the CIA divulged whether any individual, including John Patrick Savage, had any affiliation with the CIA.

At the close of oral argument on defendant's motion, the court dismissed the motion without prejudice. The court interpreted *Totten* as involving those situations when, at the time of contract, both parties had an understanding that the contract terms were secret and that neither party would ever divulge them. In dismissing the suit and prohibiting the plaintiff from divulging the contract terms in *Totten*, the Court did no more than enforce an implied provision of secrecy in the parties' agreement. Based on this interpretation of binding precedent, the court explained to the parties that *Totten* potentially could control here providing that plaintiffs reasonably should have understood when they entered into the contract that Savage's alleged relationship with the CIA was secret and would not be divulged. In this regard, the court indicated that certain facts in this case suggest such an understanding. For example, plaintiffs transferred $8 million to Savage and Deacon even though Savage alone signed the promissory note and the note made no mention of the

CIA or the United States. It would seem that if plaintiffs believed that the CIA would be liable under the note and that Savage's affiliation with the CIA was not secret, then plaintiffs reasonably would have required Savage to sign the note as an agent of the CIA. In addition, the seemingly exorbitant profit plaintiffs would have earned, turning $8 million into $35 million in a matter of weeks, provides further support for the conclusion that plaintiffs did not view the promissory note as a typical government contract readily enforceable through a breach of contract action in this court. Despite the court's suggestion that *Totten* potentially could control, the court denied defendant's motion as presented as being insufficient to support either dismissal or summary judgment.

During argument, the parties also addressed the distinct issue of application of the state secret doctrine. The Devine affidavit that defendant presented with its motion discussed national security and suggested that the state secret privilege was potentially applicable. Defendant recognized, however, that the Devine affidavit could not support a claim of state secret privilege because the affiant was not the head of the agency involved. *United States v. Reynolds*, 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953); *see infra* part V.

## IV.

In response to the court's denial of defendant's motion, defendant renewed its alternative motion for summary judgment and presented two affidavits from John M. Deutch, Director of Central Intelligence and head of the CIA. Both affidavits sought to invoke the state secret privilege and certain purported statutory privileges. Defendant filed the first affidavit on the open record and the second under seal for the court's review only.

The first affidavit explains that to promote national security the CIA has adopted a policy of not disclosing any information that would tend to either confirm or deny the existence or nonexistence of any relation-

---

That disavowal is fully consistent with the information of which I became aware during the

course of the criminal investigation.

ships or contacts between the CIA and individuals. The first affidavit states:

10. Discussion of a relationship or contacts with a specific intelligence source could cause other intelligence sources to stop cooperating with the United States for fear of their own public exposure, thus entailing the loss of important foreign intelligence to U.S. policymakers. Discussion of intelligence sources and methods would also permit foreign intelligence and security services to undertake countermeasures to minimize the effectiveness of U.S. intelligence operations. Not only could specific operations be compromised, but discussion could provide foreign intelligence entities with valuable information about CIA's activities and its methods of operation, thus allowing them to take measures in the future to counter CIA's efforts. Additionally, public discussion could embarrass the foreign government targets of our intelligence collection efforts, which may result in retaliation or, at a minimum, in disruption of foreign relations with such governments. Lastly, public disclosures have a chilling effect on CIA's ability to recruit and use cooperating sources of intelligence.

11. Moreover, if the allegations of CIA relationships or contacts are untrue and are revealed as such, such a denial will erode the ability of the CIA to decline to confirm or deny other similar allegations when relationships or contacts actually exist and the national security requires their protection. In short, if denials are provided in all cases except those where a CIA relationship or contact is present, it will soon become clear that a refusal to respond is tantamount to admitting the CIA relationship or contact.

The second affidavit, which plaintiffs have not seen, discusses in detail John Patrick Savage and the secrets over which the CIA asserts privilege. The second affidavit explains the extent, if any, of the CIA's relationship with Savage and the harm to national security that would result if the United States disclosed the existence or extent of that relationship and proceeded to litigate the merits of plaintiffs' claim.

V.

*Reynolds* describes the requirements for establishing a claim of state secret privilege as follows:

There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration of that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet to do so without forcing a disclosure of the very thing the privilege is designed to protect.

345 U.S. at 7–8, 73 S.Ct. at 532 (footnotes omitted). Plaintiffs contend that the first Deutch affidavit is insufficient to invoke the state secret privilege because it does not demonstrate that Deutch gave sufficient personal consideration to this matter or ever considered the pertinent internal records that pertain specifically to John Patrick Savage. Contrary to plaintiffs' allegations, however, Deutch expressly indicates in his first affidavit that he focused on the instant record when he states that he invoked the state secret privilege after having "personally considered this matter, ... includ[ing] reviewing the complaint and promissory note." Viewed in its entirety, the affidavit indicates that Deutch gave personal consideration to the facts necessary for him to make the claim of privilege. In any event, Deutch's second affidavit, filed under seal, clarifies what the first affidavit reasonably implies—that Deutch gave personal consideration to the facts relating to John Patrick Savage, including his alleged relationship with the CIA, and that Deutch made the decision to invoke the privilege based on an assessment of the particular harm that would result if the CIA either confirmed or denied the alleged relationship.

Under *Reynolds,* however, it is not sufficient that the head of the agency give personal consideration to all of the relevant materials before invoking the privilege. In addition, "[t]he court itself must determine whether the circumstances are appropriate for the claim of privilege." *Id.* at 8, 73 S.Ct. at 532. Herein, the evidence that militates most strongly against the court sustaining

the claim of privilege is an affidavit presented by plaintiffs, before disposition of defendant's motion to dismiss, from Lloyd N. Cutler, an attorney in private practice who formerly served as special counsel to Presidents Carter and Clinton. The affidavit states:

2. In the Fall of 1990 another Bencher of the Middle Temple [in London], Leo Price, Esquire, consulted me professionally on behalf of his client Mr. Patrick Taylor of Monarch Assurance, PLC, concerning Mr. Taylor's relationships with John Patrick Savage, who had represented himself to Mr. Taylor as connected with the United States Central Intelligence Agency.

3. In the course of my consultation with Mr. Price and Mr. Taylor I was asked to find out, if I could, whether Mr. Savage had been or was then connected with the Central Intelligence Agency. I made appropriate inquiries with persons who were then or had been officials of the Agency, promising to keep my sources confidential. I was advised that one John Patrick Savage had had a relationship with the Agency in recent years. It was not advised whether the relationship was that of a full-time official or a contractual employee. I was not advised whether the relationship was still continuing as of the date of my inquiries.

4. I promptly informed Mr. Price of the information I had learned, maintaining the confidentiality of my sources and to this date, have not advised Mr. Price of Mr. Taylor, of the identity of my source.

Such a willingness on the part of CIA employees to respond to inquiries and provide information concerning Savage's relationship with the CIA to an attorney in private practice would seem fundamentally inconsistent with the CIA's current claims that any disclosure of such information would seriously undermine national security. Moreover, plaintiff Taylor and his counsel apparently did not approach Cutler to obtain his legal advice *per se* but rather, because of Cutler's contacts with present or former CIA employees, to obtain confidential information from the CIA. The court would be inclined to interpret the scope of any privilege narrowly to the extent the CIA authorized the divulging of secret information to Cutler or used Cutler to induce plaintiffs to provide funds for covert operations.

In response to the court's concern as to the information allegedly disclosed to Cutler, defendant points to the second Deutch affidavit and an affidavit from William H. McNair, Information Review Officer for the Directorate of Operations of the CIA. In his second affidavit, Deutch describes in detail why disclosing any information regarding the existence of any relationship between the CIA and Savage and then litigating any resulting issues would compromise national security. Upon review, the court concludes that in his second affidavit, Deutch has made a convincing case for application of the state secret privilege. Thus, the court concludes that defendant has properly invoked the state secret privilege and thus is not required to respond to any discovery requests relating to the extent of any relationship between Savage and the CIA.

Plaintiffs argue that such a decision based on the evidence presented in the second Deutch affidavit would deprive plaintiffs of a fundamental right because plaintiffs have not seen the affidavit and hence cannot present arguments to the court concerning the information contained therein. Providing plaintiffs access to the second affidavit, however, would make plaintiffs aware of the very information upon which defendant claims a privilege. In such situations, courts traditionally have considered submissions *in camera* and made their decisions as to the applicability of privilege based on those submissions. *See, e.g., American Civil Liberties Union v. Brown,* 619 F.2d 1170, 1173 (7th Cir.1980) (stating that in regard to a state secret determination, an *in camera* examination of the materials should be made "without disclosing ... the text of the documents in question"). In fact, the Supreme Court in *Reynolds* noted that in some cases national security interests are so strong that the government should not be required to disclose materials even to the courts. 345 U.S. at 10, 73 S.Ct. at 533; *see also* 4 James W. Moore, *Moore's Federal Practice* ¶ 26.12[5.–4] (2d ed. 1996) (discussing the ex-

tent that *in camera* disclosures are necessary in state secret litigation).

## VI.

█ When the government successfully invokes the state secret privilege, no inference arises against the government when it resists a discovery request that seeks disclosure of the secret information. Hence, if without such discovery a plaintiff cannot make a prima facie case that it is entitled to relief on its claim, then the court must dismiss that claim. *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir.1991); *Halkin v. Helms*, 690 F.2d 977, 998 (D.C.Cir.1982). Thus, the court must next address whether plaintiffs can establish a prima facie case of breach of contract or a takings without any additional discovery from defendant concerning the relationship, if any, between Savage and the CIA.

█ The evidence presented by plaintiffs is sufficient to make a prima facie showing that John Patrick Savage was an employee of the CIA. Plaintiffs have presented, *inter alia*, two letters signed by Savage that appear to be on CIA stationery. In the January 26, 1990, letter, Savage's title reads "Assistant Deputy Director, European Affairs," and in the February 7, 1990, letter, Savage is associated with "Global Affairs." Although defendant does not admit that these documents are authentic, defendant does not deny that the documents constitute prima facie proof that Savage was a CIA employee. Defendant notes correctly, however, that to establish a binding contract with the government (Counts I and II), plaintiffs must show not only that Savage was employed or was an agent of the CIA, but also that the CIA had granted contracting authority to Savage. *City of El Centro v. United States*, 922 F.2d 816, 826 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). Similarly, to establish a Fifth Amendment taking (Count III), plaintiffs must establish that the CIA authorized Savage's actions. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898–99 (Fed. Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

To date, plaintiffs have not made a prima facie showing that John Patrick Savage had contracting authority or that his actions were authorized by the CIA. The government's successful claim of state secret privilege as to the relationship, if any, between the CIA and John Patrick Savage may very well prevent plaintiffs from making such a showing. As discussed during oral argument, however, it is at least possible that through discovery plaintiffs may be able to gather unprivileged information that, when combined with their other evidence, is sufficient to establish a prima facie case of authority. The court will provide plaintiffs an opportunity to conduct such discovery.

### *Conclusion*

For the reasons set forth above, defendant has adequately supported its claim of privilege and thus is not required to respond to any discovery relating to the existence of the relationship, if any, between the CIA and John Patrick Savage. The court will afford plaintiffs an opportunity to gather any unprivileged information that may establish a prima facie showing that John Patrick Savage had the requisite authority to bind the government in contract. Accordingly, it is hereby ORDERED:

1. Further consideration of defendant's motion for summary judgment is suspended.

2. On or before August 28, 1996, plaintiffs shall serve upon defendant any interrogatories and/or requests for depositions relating to the existence and scope of John Patrick Savage's actual authority.

3. On or before September 30, 1996, plaintiffs shall file a status report advising the court as to the status of this additional discovery.