**MONARCH ASSURANCE P.L.C.,**
**et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–518C**

United States Court of Federal Claims.

Dec. 18, 1998.

Raphael S. Moore, Sacramento, California, for plaintiffs.

Thomas D. Dinackus, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, U.S. Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

The thrust of the complaint in this action is that the United States, acting through the Central Intelligence Agency ("CIA"), executed a note payable to the plaintiffs, Monarch Assurance P.L.C. ("Monarch") and Thomas Patrick Denton Taylor. The note was executed by John Patrick Savage, who plaintiffs claim was an authorized agent acting on behalf of the CIA. Plaintiffs seek to recover the face value of that note, $35 million, or, alternatively, $8 million for an uncompensated taking of the amount paid to Savage, pursuant to the Fifth Amendment. The matter was transferred to this judge on October 2, 1998. It is pending on defendant's motion for summary judgment. The primary argument asserted for summary judgment is that the plaintiffs have been unable to put forward prima facie proof that any authorized agent of the United States executed the note. Oral argument was heard on December 11, 1998.[1] For the reasons explained below, the motion is granted.

## I. PROCEDURAL BACKGROUND

■ Familiarity with the court's prior rulings is assumed, but they will be briefly summarized. *Monarch Assurance P.L.C. v. United States*, 36 Fed.Cl. 324 (1996); *Monarch Assurance P.L.C. v. United States*, No. 94–518C, slip op. (Fed.Cl. July 31, 1995). Defendant filed a motion for summary judgment[2] on December 15, 1995, asserting that a fact necessary to plaintiffs' success—the existence of a legally binding relationship between the CIA and John Patrick Savage—could not be litigated because of the state secrets privilege.[3] Judge Andewelt ruled that plaintiffs had presented sufficient documentary evidence to put forward a prima facie case that Savage was an employee of the CIA. Nevertheless, he found that the evidence presented was not prima facie proof that Savage was authorized to execute a note on behalf of the CIA. With respect to plaintiffs' request to the agency for information to confirm or deny a relationship and the requisite authority, he held, after examining in camera an affidavit from the head of the agency, that the state secrets privilege[4] was properly invoked.[5] Defendant is thus not

---

1. In a letter dated December 16, 1998, counsel for plaintiff suggested that further argument was necessary to consider: (1) use of the classified declaration for review of the merits; and (2) waiver of the state secrets privilege. The court declines to grant this request. These issues are implicit in the prior argument.

2. The court had previously denied without prejudice a motion to dismiss predicated on the "Totten" defense, which prevents a party from suing on a contract for clandestine services. *See Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875). The court interpreted *Totten* as applying only in those situations "when, at the time of contract, both parties had an understanding that the contract terms were secret and that neither party would ever divulge them." *Monarch*, 36 Fed.Cl. at 326 (referring to prior unpublished order). The court found that the motion was, at least for the time, insufficiently supported to warrant dismissal.

3. Defendant also offered evidence suggesting that Savage was not a CIA agent but rather a con artist who had no connection at all with the CIA.

4. The state secrets privilege is one of common law origin. It exempts an executive agency from an obligation of disclosure it would otherwise have in litigation when disclosure would be injurious to the national interest. The privilege must be invoked by the head of the agency, who must satisfy the court that the privilege is properly asserted. *See United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *see also Guong v. United States*, 860 F.2d 1063, 1066 (Fed.Cir.1988).

5. The court made the following findings:

   The second affidavit, which plaintiffs have not seen, discusses in detail John Patrick Savage and the secrets over which the CIA asserts privilege. The second affidavit explains the extent, if any, of the CIA's relationship with

obligated to provide any information concerning the relationship, if any, between Savage and the CIA. Judge Andewelt did not grant summary judgment at that time, however. Instead, he permitted the plaintiffs to attempt to establish, by means other than privileged information, a prima facie case that someone with sufficient authority at the CIA signed the note and thereby obligated the agency.

Plaintiffs conducted limited discovery, to some of which defendant objected.[6] Further briefing was permitted along with oral argument. The matter is now ready for disposition.

## II. FACTUAL BACKGROUND

Plaintiffs allege that they were approached by a British solicitor, Charles J. Deacon, with an offer. The CIA needed money to support certain covert projects but could not use its own funds directly. In exchange for the payment of $8 million to Deacon and to John Patrick Savage, Savage issued a promissory note on April 26, 1990, obliging, according to Savage, the CIA to pay plaintiffs $35 million on or before April 30, 1990. The only issuer named on the promissory note was Savage, although it was apparently independently guaranteed by Deacon.[7] The note made no mention of the CIA, the United States, or any other third party.

Neither Savage, Deacon, nor the CIA paid the note when due. Plaintiffs successfully sued Deacon in the English courts and won a $35 million judgment. They have been unable to collect on the judgment and now sue the United States.

Plaintiffs allege that Savage was an agent of the CIA. They rely primarily on the following evidence. A letter written to Deacon, dated January 26, 1990, on what appears to be CIA stationary. The letter is signed by Savage, who shows his title as "Assistant Deputy Director, European Operations." A second CIA letter signed by Savage to Deacon, dated February 7, 1990, shows Savage's title as "Global Affairs." Neither letter contains any description of Savage's job responsibilities with the CIA, and indeed, are free of any clue as to what Savage did. Deacon states in a declaration submitted for this litigation that he was a solicitor for Savage, and that Savage represented to him that he, Savage, was "with the United States Central Intelligence Agency." It was Deacon's "belief" that Savage was "with the Central Intelligence Agency" in some official capacity. He also refers to conversations with an individual named Lee Morris who was "involved on an independent basis" with the CIA. Morris, he states, told him that he knew Savage well and that he had "worked across the desk" at CIA headquarters with him.

*Monarch*, 36 Fed.Cl. at 327–28.

Savage and the harm to national security that would result if the United States disclosed the existence or extent of that relationship and proceeded to litigate the merits of plaintiffs' claim.
. . . .
In any event, Deutch's second affidavit, filed under seal, clarifies what the first affidavit reasonably implies—that Deutch gave personal consideration to the facts relating to John Patrick Savage, including his alleged relationship with the CIA, and that Deutch made the decision to invoke the privilege based on an assessment of the particular harm that would result if the CIA either confirmed or denied the alleged relationship.
. . . .
Upon review, the court concludes that in his second affidavit, Deutch has made a convincing case for application of the state secret privilege. Thus, the court concludes that defendant has properly invoked the state secret privilege and thus is not required to respond to any discovery requests relating to the extent of any relationship between Savage and the CIA.

6. At the most recent oral argument, plaintiffs' counsel contended that his clients had not been granted all the discovery to which they are entitled. This late argument is unpersuasive. Judge Andewelt permitted limited discovery by deposition of those individuals plaintiffs asserted were most likely to have information about Savage's status. The court also has recently reviewed the interrogatories to which defendant objected and finds that, although plaintiffs did not challenge the objection at the time, the court would have sustained it on the basis of the state secrets privilege (interrogatories one and two) or on the basis that the information sought was completely irrelevant (interrogatory three). In a joint status report dated March 10, 1997, the parties reported that the limited discovery was complete.

7. There is typed on the note a guarantee by National Westminster Bank. It is unexecuted.

Deacon recites that he guaranteed the note. On that basis he was sued by the plaintiffs in England and became subject to the previously-mentioned judgment for $35 million. He was also convicted of fraud in connection with this matter.

Reference is made in the February letter [8] to "Bluebook" and "ULTIMA" which are described by Deacon as two projects then being undertaken by the United States government.[9] There is a letter in the record from President George Bush to Deacon, dated March 14, 1990, which expresses the President's appreciation for Deacon's assistance with "ULTIMA–BLUEBOOK." [10]

Plaintiffs submitted the declaration of Thomas Patrick Denton Taylor, the Chief Executive and Managing Director of Monarch. He acted on behalf of Monarch in dealings with Savage. After non-payment of the note, Taylor and another solicitor, Leolin Price, consulted with Lloyd N. Cutler, a Washington attorney, seeking to use him as an intermediary with the CIA to obtain payment. Taylor recites that Cutler told him, after Cutler made inquiries with the CIA, "that a John Patrick Savage had been with the [CIA]. He stated that we should approach the FBI, and that if we were lucky, that might bring about repayment of the money. Mr. Cutler did not give any explanation as to his statements." In later conversations, Cutler said that Savage had been "with" the agency "as far back as twenty years." Cutler later prepared an affidavit, discussed in the earlier opinion, indicating that he had been told by persons who "were then or had been" officials of the CIA that one John Patrick Savage "had had a relationship with the Agency in recent years" and that he had not been advised "whether the relationship was that of a full-time official or a contractual employee."

Plaintiffs also offer the declaration of Axel Karlshoj, managing director of Nordisk Industries. He states that he was approached to serve as a conduit between Savage and certain investors, such as plaintiffs, who were owed money as a result of the "dealings of Mr. John Savage." Karlshoj recites that an intermediary, Lee Morris, represented that Savage was "acting on behalf of the [CIA]." According to Mr. Karlshoj, Mr. Morris' role was to fix "problems caused in Europe by Mr. Savage who had 'crossed the line.'" [11]

The declaration of Edgar Giudo Reynolds is also offered. He at one time held power of attorney for Savage and was his friend. After explaining how he met Savage and heard Savage speak of his access to large sums of money and his connection with an unnamed "Company," he concluded that "Savage was an employee of the Government or of the Administration of the United States of America, and in particular, the CIA." Savage, in short, "distinctly gave me the impression of being a representative/employee of the C.I.A." There was "never any doubt from the outset that he was an important person within the C.I.A."

Judge Andewelt also had available excerpts from interviews conducted by law enforcement personnel with John Patrick Savage shortly before his death. In those interviews, Savage states that "I have never been an employee of the ... [CIA]." He was asked the question, "But you never worked the CIA, did you?" He answered, "No, no." He told the investigators that Deacon at one point thought he, Savage, was associated with the CIA, but "later

8. A letter dated January 4, 1990 from First Interstate Bank, Ltd., to Savage shows his title as "Deputy Director, European Operations." The letter refers to transfers of funds but gives no information from which the court could determine what Savage responsibilities at the CIA were.

9. Plaintiffs also include a letter signed by William Webster, Director of the CIA, and John Sununu, White House Chief of Staff, ratifying the conduct of Charles Deacon as the government's "duly authorized representative" in the ULTIMA and Bluebook affairs. The letter purports to indemnify them from any liability he may have incurred.

10. Plaintiffs submitted the declaration of a handwriting expert, Patricia Fisher, stating that the Bush signature appears to be valid; that the Savage signatures are consistent with other signatures by Savage; and that the CIA logo on the stationary is consistent with official stationary.

11. Morris stated in his deposition, however, that he was not with the CIA and did not represent himself as having been with the agency.

found out [I was] not associated with that organisation [sic]." Savage also said that he had "no warrant of authority" for the agency.

The material summarized to this point was available to Judge Andewelt prior to his decision that the plaintiffs had put forward sufficient evidence to shift to the government the burden of proving that Savage was not a CIA employee, but insufficient evidence that Savage, even assuming he was an employee, was authorized to bind the agency to payment of a note for $35 million. The motion for summary judgment was put on hold pending plaintiffs' efforts to locate unprivileged information sufficient to create a prima facie case of authority.

What additional evidence have the plaintiffs produced to create a prima facie case of authority? Attached to plaintiffs' July 7, 1997 brief in response to the court's order is the declaration of Boris Z. Sielicki–Korczak. He is currently an investigator with the National Police Defense Foundation. He recites that he was once an "access agent" with the CIA authorized to collect raw intelligence on behalf of the agency.[12] He states that this role gave him insight into "the authority held by those of higher positions." The precise wording of his contribution to the discussion here is important. In connection with Savage's putative title he had the following to say:

5. A person titled, "Assistant Deputy Director European Operations" would have the requisite authority to enter into transactions and agreements described in Paragraphs III through V of the First Count of the complaint in this case.

6. An example of the type of authority that may be held by an individual working on behalf of the CIA ("the Individual"), is the case where the Individual is required to carry out a specific task on behalf of the CIA. The task may be, for instance, the securing of specific information from others, or the solicitation of financial backers for whatever purpose.... *In order to carry out the assigned task, the Individual would be authorized by the CIA to claim to have a title or affiliation which would convince others to put faith in the individual.* Likewise, the Individual would be authorized to make promises which would make it more likely that the end task assigned would be achieved. Such promises may be done by entering into contracts.

7. *In choosing a title,* the Individual will ordinarily choose one which is *not* equivalent to a top most ranking, but rather a lesser and more believable ranking. That is, the Individual will not claim to be the "Director" of any known department, but rather a lower ranking person, such as a deputy or assistant, of a department that is not commonly known. *In the above captioned case, the title of Assistant Deputy Director European Operations is a prime example. It is more believable, and harder to refute, than the title of the Director European Operations. Similarly, the stated affiliation with "Global Affairs" is sufficiently broad and non-descript to make it more likely to be believable.*

(italicized emphasis added.)

Also included in the latest filings is an excerpt from the deposition of Lee Morris, the individual referred to previously in both Deacon's and Karlshoj's declarations. Morris is a retired officer of the United States Navy. The excerpts from his deposition hint generally at some unofficial involvement with the government in a clandestine capacity, but he denies any official capacity with the CIA and gives no basis for or any firsthand knowledge about delegations of authority. Instead, he testified in what can only be described as elliptical phrases about mysterious Japanese business deals and international foundations set up for unspecified purposes, and that Senator Arlen Spector may be knowledgeable about these circumstances

---

12. A letter submitted by plaintiff from Congressman James A. Traficant, Jr. states that he has been informed "by official sources that Boris Korczak was employed by the [CIA] as an access agent."

for some unspecified reasons. The connection plaintiffs ask the court to draw between the existence of this large fund and Savage is that the fund was used to clean up the obligations created by Savage, such as the promise to plaintiffs. From this the plaintiffs ask the court to draw the inference that Morris must know what he is talking about when he is quoted in Alex Karlshoj's declaration as saying that Savage "acted for the CIA." The strength of the Karlshoj reference is substantially undercut, however, when Morris, upon being shown the Karlshoj declaration, referred to it as fiction.

The court notes, however, that Morris offered the view, not inconsistent with the prior excerpt from the Sielicki–Korczak's statement, that "you don't have to be too smart to understand that there is no such animal out there," referring to Savage's supposed position of "Deputy Director for European Operations."

The most recent proffer is an affidavit from plaintiffs' counsel, Raphael Moore, filed December 14, 1998. He recites that he has had conversations with someone named George Willis. Willis lives in Northern Ireland and has lost money to John Savage, "who he believed was with the [CIA]." Although counsel had knowledge of Willis earlier, the affidavit is based on contacts that were re-initiated in July, 1998. Willis told counsel that he has had "contacts with one or more representatives of the [CIA], with regards to the 'Savage matter.'" Most recently, counsel contacted Willis on December 4, 1998, to inquire "what further information he had." Counsel relates that Willis told him that he had had repeated discussions with two individuals at the CIA who could be reached through the agency's public switchboard number. Mr. Willis, who asked to be connected to "the Director's office," was allegedly told by someone named Scotty Malone that John Savage "was not an agent" of the CIA. Nevertheless, if Willis could prove that " 'Savage was CIA', 'they' would pay him his loss." Willis also allegedly spoke with three other individuals who were equally

forthcoming. Plaintiffs argue that this garrulousness emanating from the heart of the agency, along with Lloyd Cutler's affidavit, suggest that the state secrets privilege has been waived.

## DISCUSSION

■ The question previously posed by Judge Andewelt is, "have plaintiffs put forward prima facie evidence that Savage was authorized to act on behalf of the CIA?" A catalog of the proffer can lead only to a resounding, "No." The note itself, shows nothing. The letters signed by Savage show no authority, and the court declines to infer authority from any of the three titles Savage chose to use: "Assistant Deputy Director, European Operations," "Deputy Director, European Operations," or "Global Affairs." Defendant is correct that authority must either be expressed, typically shown by a written delegation, or implied from actual authority, expressly conferred. Acknowledging the lack of evidence of an expressed delegation of either authority or duty, and because the court is unable to draw negative inferences against the agency from its invocation of the state secrets privilege, the plaintiffs ask the court to find in their submissions prima facie evidence that Savage had certain duties which could not be performed without his being authorized to sign large notes on behalf of the agency.

The plaintiffs' theory runs as follows. They begin with the assumption, accepted by Judge Andewelt for procedural purposes, that Savage had some sort of relationship with the CIA. From Deacon's declaration, we know that Deacon had certain commercial relationships with Savage, who he suspected was with the CIA. From the Webster/Sununu and Bush letters, as well as the Deacon declaration, it can be inferred that there were large, CIA-backed projects involving the generation of large sums of money. Also from the declarations of Deacon and Karlshoj, we are acquainted with Lee Morris, who was "with the CIA" and who worked with Savage.[13] Morris' deposition, in turn,

13. The Reynolds declaration can be ignored as innocuous twaddle ("I distinctly remember the secrecy he would have about opening a silver-coloured, metal brief case which had combination locks. During all the time that I knew

supports the idea that there were large-scale efforts, indirectly connected to the government, to raise money, in part to clean up obligations created by Savage. From Taylor, we learn that Savage persuaded him to part with $8 million. All this points, according to the plaintiffs, to an official duty in Savage to separate investors from their money. If Savage had this duty, plaintiffs contend, it only follows that he must have been authorized to obligate the CIA, not only to repay that money, but to pay it back within a week at what can only be described as interest rates that would make a loan shark blush.

As defendant cogently points out, this evidence has a serious shortcoming: plaintiffs are left with nothing more than Savage's own actions as evidence of his duties or authority. He wrote the letters. He spoke to Taylor, Morris, and Deacon. He took the money. He promised to pay it back. According to Sielicki–Korczak, Savage himself simply picked a plausible title, which the plaintiffs now ask the court—on no direct evidence—to infuse with whatever authority it takes to issue binding promises. Even if the court assumes Savage had some connection with the agency, plaintiffs' showing is utterly insufficient to create any presumption of authority, not merely to borrow money, but to obligate the agency to pay it back within the week at 330% interest. While recognizing some obligation, given the procedural posture of the case and plaintiffs' proof limitations, to be generous in viewing the evidence, testing a response to summary judgment does not require the court to suspend reason. The daisy chain of credulous inferences plaintiffs ask the court to make simply lacks the necessary tensile strength to permit the case to proceed. At no point would the chain be supported by anything stronger than apparent authority, a non-existent species in suits against the sovereign.

Moreover, the court declines to find any waiver of the state secrets privilege because it cannot accept the substance of the Moore affidavit.[14] There must be a limit to the court's credulity. The policy of the CIA to neither admit nor deny a relationship with an individual has been fully explained in this proceeding. The importance of that policy in general, as well as in the present circumstances has been presented by the Director of the agency in the gravest terms. The court acknowledged those concerns in honoring the invocation of the state secrets privilege. The notion that, after those seemingly sincere assertions, the Director's office promiscuously gives out the same information to anonymous callers is simply not credible. It requires a suspension of reason that the court is unwilling to indulge. There is no waiver of the state secrets privilege. It follows that the earlier discovery rulings are undisturbed.

If, without discovery that is inconsistent with the state secrets privilege, a plaintiff cannot make a prima facie case that it is entitled to relief on its claim, then the court must dismiss that claim. *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir.1991); *Halkin v. Helms*, 690 F.2d 977, 998 (D.C.Cir.1982); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir.1980). As plaintiffs are unable to present any credible evidence that Savage had the authority to bind the United States to repay the note, the claim must be dismissed.

■ The court also adopts an alternate rationale for dismissal. At oral argument, the court asked the parties what would result if there had been evidence of authority, i.e., if the case went forward. Not surprisingly, they disagree. Defendant has consistently taken the position that "CIA Director

---

Savage he never allowed me nor anybody else to see into his brief case.").

14. When, during oral argument, the court asked counsel whether the double hearsay upon which he asked the court to set aside the state secrets privilege met the requirements of RCFC 56(f) (facts must be admissible in evidence), he pointed to that portion of the affidavit that recites that "Mr. Willis stated to me that he would not provide any declaration out of fear [of arrest]."

Accordingly, Mr. Willis is thus presumably unavailable. It is far from clear that his unavailability has been established within the terms of Fed.R.Evid. 804(a). Moreover, plaintiff did not, and in the court's view could not, point to any of the hearsay exceptions in Fed.R.Evid. 804(b) to which 804(a) necessarily relates. In any event, the balance of the affidavit would still comprise single hearsay.

Deutch's classified declaration is sufficiently detailed to permit the court to review the United States' response to the plaintiffs' prima facie showing. In either case the court should enter judgment in favor of the United States regarding the claim if the court determines that any defense asserted in the classified declaration is sufficient to defeat the claim." Def.'s Resp. to Pls.' Supplemental Br., June 28, 1996. Presumably this would have to be done in such a way that the point of invoking the privilege was not defeated.

Plaintiffs' understanding of the case law is that the state secrets privilege is merely an evidentiary one. In other words, its sole effect is that the court cannot draw negative inferences from the government's failure to put on evidence rebutting the claim that an individual is acting as an agent for the United States. *See Bareford v. General Dynamics Corp.*, 973 F.2d 1138, 1141 (5th Cir.1992) (discussing different lines of authority), *cert. denied*, 507 U.S. 1029, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993). The obvious anomaly this creates is that the defendant, even if it had a good defense on the merits, is prevented from asserting the defense if it wishes to insist on the privilege.

The primary authority upon which plaintiffs' counsel relied during oral argument, *Farnsworth Cannon, Inc. v. Grimes*, does not provide the necessary support. Counsel apparently was relying on the initial decision of a divided three-judge panel. That decision was later overturned on rehearing en banc. *See Farnsworth Cannon*, 635 F.2d at 280.

Some courts have taken the position that the way out of the dilemma is to preclude any suit "when the privileged material is central 'to the very question upon which a decision must be rendered.'" *Bareford*, 973 F.2d at 1142 (quoting *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1244 (4th Cir.1985)). This approach is based on the concern that it may be impossible to avoid compromising national security. *See Bowles v. United States*, 950 F.2d 154, 156 (4th Cir.1991).

A somewhat different approach has been taken in some cases in which the United States, as defendant, would otherwise have been able to rely on the unavailable information for its defense. In *Molerio v. FBI*, 749 F.2d 815, 822 (D.C.Cir.1984), for example, the court was faced with disputed issues of material fact, even after the successful invocation of the privilege. The court thus had to decide whether to dismiss the case because the defendant would be unable to respond on the merits. Then–Judge Scalia wrote for the court in explaining why the claim would not be allowed to proceed:

> It seems to us ... that the effect of our determination with regard to the state secrets privilege is to prevent this issue from proceeding.... [W]e satisfied ourselves that the in camera affidavit set forth the genuine reason for denial of employment, and that that reason could not be disclosed without risking impairment of the national security. As a result ... the court knows that the reason Daniel Molerio was not hired had nothing to do with ... assertion of First Amendment rights. Although there may be enough circumstantial evidence to permit a jury to come to that erroneous conclusion, it would be a mockery of justice for the court—knowing the erroneousness—to participate in that exercise.

749 F.2d at 825. *Molerio* has been cited with approval by this court. *See McDonnell Douglas v. United States*, 37 Fed.Cl. 270, 280 (1996).

It is the view of this court that the analysis of *Molerio* should be adopted in the present circumstances. This suit therefore could not succeed in any one of three circumstances: 1) If Savage was an authorized agent of the CIA but the court is persuaded that permitting the suit to continue would irreparably damage national interests; 2) if Savage was never an agent or employee of the CIA; 3) if Savage was an agent or employee of the CIA but had insufficient authority to commit the agency to the obligations sued on here. The court has read both Deutch affidavits and, as defendant suggests, the in camera affidavit presents one of these defenses in terms that the court fully accepts. Accordingly, even if the evidence before the court should be read more generously, the case would still be dis-

missed.[15]

## CONCLUSION

The case must be dismissed for either of two independent reasons. First, plaintiffs have been unable to put forward credible prima facie evidence that Savage was an agent of the United States authorized to sign the note in question, and second, because the court's in camera review of the Deutch declaration demonstrates a complete defense which the court will not permit the plaintiffs to examine further. Accordingly, the motion for summary judgment is granted. The clerk is directed to dismiss the complaint. Costs to the United States.

15. The court agrees with the defendant that this also disposes of the alternative taking claim. That claim is based on the argument that the plaintiffs' inability to proceed on their contract theory deprives them of property in violation of the Fifth Amendment. There are a number of difficulties with that theory on the merits, but they are all mooted by the consideration that entertaining this as a takings claim would either be futile (for the same reason, i.e., that the state secrets privilege would preclude evidence of a claim or defense) or would be an impermissible way to avoid the privilege.