**CITY OF EL CENTRO,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES,**
**Defendant–Appellant.**

No. 90–5003.

United States Court of Appeals,
Federal Circuit.

Dec. 28, 1990.

J. Mark Waxman, of Weissburg and Aronson, Los Angeles, Cal., argued for plaintiff-appellee. Of counsel was James R. Kalyvas.

Stephen J. McHale, of Dept. of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., and David M. Cohen, Director.

Before RICH and PLAGER, Circuit Judges, and DUPLANTIER, District Judge.[*]

PLAGER, Circuit Judge.

Plaintiff-appellee City of El Centro, State of California, owns and operates El Centro Community Hospital (ECCH). ECCH found itself treating 14 illegal aliens injured, some seriously, when the vehicle in which they were riding crashed while attempting to flee United States Border Patrol agents. The course of treatment of these individuals incurred $183,263.64 in costs for ECCH. ECCH requested defendant-appellant United States Government to pay these costs. The Government refused to pay. The Claims Court found an implied-in-fact contract and granted relief to ECCH. *City of El Centro v. United States*, 16 Cl.Ct. 500, *reconsid. denied*, 17 Cl.Ct. 794 (1989). Despite the appealing nature of plaintiff's case, as a matter of law we reverse.

## I. Background

Early in the morning of January 23, 1985, Border Patrol agents observed several vans parked on the American side of the

[*] The Honorable Adrian G. Duplantier, United States District Court for the Eastern District of Louisiana, sitting by designation.

border between the United States and Mexico, near El Centro, California. The vans were parked in an area known to be a rendezvous point for smugglers of illegal aliens. At about the same time, the Border Patrol had indications that a group of people was moving on foot in the general direction of the vans.

A short time later, the agents saw one of the vans traveling eastward on the highway. The agents followed in their vehicle, activating their emergency lights. The van did not stop and a high speed chase began. With the border patrol agents in hot pursuit, the van raced along California Highway 8. In an unsuccessful attempt to elude the pursuing agents, the van, still travelling at speeds in excess of 60 miles per hour, swerved off the highway and onto an exit ramp. Reaching the top of the ramp, the van failed to negotiate a turn and, vaulting over an embankment, crashed, exploded and burned.

The pursuing agents quickly arrived at the crash scene, extinguished the flames and radioed for assistance. Fourteen aliens in the van were taken by ambulance to ECCH for treatment. The driver and two of the passengers died in the accident.

Responding to the emergency call, ECCH prepared for the arrival of the injured aliens. Medical personnel as well as Assistant Director of Finance for ECCH, Kaye Fox, arrived at ECCH ahead of the injured aliens. Uniformed Border Patrol Agent Mario Hernandez also arrived at the hospital ahead of the injured aliens. The Claims Court found that when Ms. Fox asked Agent Hernandez who would pay for the treatment of the aliens, Agent Hernandez responded, "me and you" [sic]. Ms. Fox testified[1] that it was her understanding, based on her conversation with Agent Hernandez, that the Border Patrol would be responsible for the costs of hospitalization.

Agent Hernandez instructed the hospital to notify the Border Patrol prior to the release of any of the aliens so that each alien would be released from ECCH directly into the custody of the Border Patrol. While hospitalized, the aliens were photographed by Immigration and Naturalization Service (INS) investigators and had their medical records reviewed by an INS doctor visiting ECCH. At least one INS investigator also signed ECCH consent forms for those aliens unable to sign. The investigator signed on a line marked "Patient/Parent/Conservator/Guardian."

The Claims Court found that an implied-in-fact contract was created and that ECCH was entitled to recovery under that contract.

## II. Discussion

### A.

The Constitution vests in the Federal Government the authority and responsibility to protect the integrity of the borders of the United States. U.S. Const. art. I, § 8; *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1891). In the course of implementing this responsibility, Congress has assigned the duty of apprehending aliens who illegally enter the country to the Attorney General. The Attorney General carries out this duty, in part, through the vehicle of the Border Patrol Division of the Immigration and Naturalization Service's Office of Enforcement. *See* 8 U.S.C. § 1103(a) (1988); 28 C.F.R. § 0.105 (1990); 8 C.F.R. § 100.2 (1990).

In this case, the Border Patrol, in the apparent lawful exercise of its authority, set in motion a chain of events which imposed significant costs upon the hospital. There can be little question but that these are costs incurred as a natural and foreseeable consequence of the conduct by the United States Government in fulfilling its Constitutional duties. As a matter of equity, there is good argument that these costs should be assessed against all the taxpayers of the United States. The question before the court, however, is whether, as a matter of law, the United States is obligat-

---

1. Ms. Fox's testimony was in the form of a videotaped deposition as she had died prior to trial.

ed to pay these costs, or whether, as it has chosen to do, the Government is free to let these costs fall upon ECCH and those whose obligation it is to support the hospital.

The Government is of the view that there is no legal basis under which the hospital can be reimbursed for these costs. It argues that there was no express or implied contract for services that met the statutory requirements for contracting with the United States. The Government argues further that the injured aliens were neither in the Government's custody, nor had the Government assumed responsibility for their care.

ECCH argues that the Border Patrol's hot pursuit of these individuals was sufficient for a court to find that the aliens were in custody, and that as a result they were under the care of the Government so that the services rendered to them were the usual medical services rendered upon authorized request for persons in Government custody, and for which payment is statutorily provided. In the alternative, ECCH argues that the conduct of various INS agents in the course of these events created an implied-in-fact contract.

We review findings of fact from the Claims Court under the clearly erroneous rule. As regards the legal conclusions of the Claims Court, we will affirm the court's conclusions unless they are incorrect as a matter of law. Fed.R.Civ.P. 52(a); *Heisig v. United States*, 719 F.2d 1153, 1158 (Fed. Cir.1983).

### B.

■ ECCH cites two statutes as the basis for its claim that the Government is mandated by law to pay these medical expenses. The Claims Court held neither to be applicable. Title 8, United States Code, section 1252(c) (1982), cited by ECCH, authorizes the Attorney General to expend funds for, *inter alia*, the operation of facilities for the detention of aliens against whom a final order of deportation has already been made. The Claims Court correctly observed that the "plain language precludes its being read as a money-mandating provision." 16 Cl.Ct. at 504.

■ The other statutory section on which ECCH bases its argument is 42

U.S.C. § 249 (1982). Section 249(a) provides that "any person detained by [the Immigration and Naturalization Service], may be treated and cared for by the Public Health Service." When treatment is supplied outside of a Public Health Service facility or by other than Public Health Service personnel, § 249(c) provides:

> Persons whose care and treatment is authorized by subsection (a) of this section may, in accordance with regulations, receive such care and treatment at the expense of the [Public Health] Service from public or private medical or hospital facilities other than those of the [Public Health] Service, when authorized by the officer in charge of the [Public Health Service] station at which the application is made.

As the Claims Court noted, the problem with this provision from ECCH's viewpoint is that it does not *mandate* compensation, but simply provides authorization for payment when properly requested and authorized by the designated government agent. Furthermore, the parties appear to have misread § 249(c) by suggesting that the care and treatment of the aliens potentially authorized by that section is the responsibility of the Immigration and Naturalization Service rather than the Public Health Service. Section 201(a) states that "[t]he term 'Service' means the Public Health Service."

For the aliens in the present matter to fall within the ambit of § 249 authority, ECCH would have needed to show that application for payment was "authorized by the officer in charge of the [Public Health Service] station" where that application was made. The record shows that discussions regarding payment involved Border Patrol Agent Hernandez and that claims for payment were submitted only to the INS, not to the Public Health Service.

The Claims Court found that "[n]o 'application' was made to a Public Health Service station nor approved by the 'officer in charge of the station.'" 16 Cl.Ct. at 504. We agree and therefore § 249 does not provide authorization for reimbursement of the expenses incurred by ECCH in treating the aliens.

### C.

ECCH considered that, in addition to the statutory theory for recovery discussed above, it had an independent cause of action in contract. With regard to ECCH's argument that the contract was implied-in-law—that is, a restitutionary theory—the Claims Court held that Congress had not relinquished the Government's sovereign immunity with respect to implied-in-law contract obligations. 16 Cl.Ct. at 505. Neither party has disputed that holding in this appeal.

■ The Claims Court, however, agreed with ECCH that there was an implied-in-fact contract, obligating the Government to pay for the medical services rendered to the injured aliens. The Government disputes this holding. An implied-in-fact contract requires findings of: 1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982). When the United States is a party, a fourth requirement is added: the Government representative "whose conduct is relied upon must have actual authority to bind the government in contract." *Juda v. United States*, 6 Cl.Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)).

### 1.

■ The Government argues that it did not intend to enter into a contract and that Agent Hernandez did not have authority to bind the United States in contract. The Claims Court held that, as a matter of fact, the various discussions between employees of the Government and of ECCH when taken as a whole evidenced a sufficient meeting of the minds to establish mutuality of intent to contract. We cannot say that that finding is clearly erroneous.

With regard to the question of whether the Government's agents had authority to bind the Government in contract, ECCH argues: that Agent Hernandez was the Government official sent to ECCH to coordinate the situation; that the agent's supervisor, Agent Roy, knew of the discussion between Agent Hernandez and Ms. Fox; and, that because no Government representative did anything to dispel Ms. Fox's belief that the Government would pay the expenses incurred by the aliens, the supervisor, and therefore the Government, had ratified Agent Hernandez's statements and had bound the Government in contract.

The Claims Court concluded that it knew of "no statute, regulation or case which would preclude Agent Hernandez' exercise of government authority to obligate funds for emergency medical treatment of detainees injured during the course of apprehension." 16 Cl.Ct. at 508. But the issue is not whether some authority exists that prohibits Agent Hernandez from obligating the Government in contract; rather, the issue is whether Agent Hernandez had been granted the authority to affirmatively obligate the Government. No such authority has been cited by ECCH nor is such authority evident from the record.

The United States Government employs over 3 million civilian employees.[2] Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States. Regardless, ECCH argues that Agent Hernandez had authority to bind the Government in the instant matter. We disagree.

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 384, 68 S.Ct. at 3. Further, it is ECCH's responsibility to show that Agent Hernandez had the requisite contracting authority. *Housing Corp. of America v.*

---

2. M. Hoffman, *World Almanac and Book of Facts 1990* 106 (1990).

*United States*, 199 Ct.Cl. 705, 468 F.2d 922, 925 (1972).

The Claims Court believed this to be an emergency situation such as that described in *Halvorson v. United States*, 126 F.Supp. 898 (E.D.Wash.1954), where, following a three day Montana blizzard, the weight of snow on several partially-constructed government buildings threatened their safety. The local Corps of Engineers officer enlisted immediate assistance of others to save the buildings. He was held to have authority to obligate the Government to pay for such aid.

The present situation is not one in which emergency action must be taken by government agents to protect life and property, and an implied authority to obligate government resources is found. In terms of the medical needs of the injured aliens, Federal officials had no care-providing duties to perform. The hospital was preparing to attend to the injured aliens; the only question was payment. Even assuming the casual remark by Agent Hernandez could be considered a serious contractual undertaking on behalf of the Government, ECCH failed to meet its burden of showing authority to contract. It is reversible error for the trial court to have found such authority vested in Agent Hernandez.

Even so, ECCH argues, because Supervisor Roy was aware of the conversation between Ms. Fox and Agent Hernandez regarding payment for costs incurred by the aliens, and because no INS representative overtly sought to dispel any possible misconception about such payments, some type of "institutional ratification" had occurred. Again, we disagree.

The Claims Court cited *Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982), as binding authority in this Circuit that permits a finding of *institutional* ratification. 17 Cl.Ct. at 798. *Silverman* was a suit by a subcontractor (a court reporter) against the Government for unpaid services he had performed, and which the

Government acknowledged it had received. The contractor who had the contract with the Government to provide the stenographic services found itself in financial difficulty, at a time when, without having paid the subcontractor for his work, it had already received partial payment from the Government for the services. When plaintiff Silverman realized that his employer-contractor was in financial difficulties, he contacted a senior official of the Federal Trade Commission (FTC) for whom the services were being performed. That official, *who had authority to approve vouchers for payment for goods and services*, told plaintiff that if he would provide the remaining services and deliver the remaining transcripts, he would "see to it that the plaintiff received payment...." *Silverman*, 679 F.2d at 868. And he did. He paid plaintiff some $7488.19 of the $10,091.71 plaintiff claimed was due him for all his as yet unpaid services; plaintiff sued for the balance due.

The court agreed that plaintiff as a subcontractor had no contract with the Government—"the subcontractor cannot properly maintain an action in such a situation"—but that an implied-in-fact contract arose, ratified by the action of the FTC in accepting the benefits flowing from the senior FTC official's promise of payment: "the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official's promise." *Id.* at 869–70.[3]

By contrast, in the case before us there was no promise, certainly no express promise, by an official empowered to bind the Government to pay for the care rendered. ECCH has not shown that any individual with contracting authority exercised that authority to bind the United States in this matter.

2.

■ A second requirement for finding an implied-in-fact contract is consideration.

---

**3.** The case took a curious twist. The court found that the implied-in-fact contract was only for those services for which the Government had not already paid the contractor. As a con-

sequence, not only did plaintiff not get the balance for which he sued, but he had to return part of the money that the Government had paid him.

The Government received none. ECCH argues that because the aliens were detained by the Government and because the Government is responsible for the care and treatment of such detainees,[4] the care given by ECCH to the aliens conferred a benefit on the Government and was thus consideration in an implied-in-fact contract.

The Government's responsibility to care for the aliens is set out in § 249. As previously noted, the language of § 249 is permissive—"any person detained by the [INS] *may* be treated and cared for ..." (emphasis added)—rather than mandatory. Further, § 249 would only apply to the aliens if they were "detained" by the INS. The meaning of the term "detained" in § 249 is a question of law based on the underlying facts. In this case, the Claims Court found as a fact that at no time during the period at issue was physical custody taken of the aliens by INS. *City of El Centro v. United States*, No. 208–86C, bench ruling at 260–61 (Cl.Ct. Dec. 18, 1987). Nevertheless, the court held that the term encompassed a "de facto detention" which existed as a result of the conduct of the INS. 16 Cl.Ct. at 504.

In the absence of a statutory or judicial definition of "detained" as it is used in § 249, we look to analogous law. An area in which fact patterns comparable to this have arisen is search and seizure law, specifically, when government action, typically by police, results in the seizure of a person under the Fourth Amendment.

The Supreme Court has phrased the test of when the Government has "seized" someone in various ways: a meaningful interference with an individual's freedom of movement, or a willful governmental termination of an individual's freedom of movement through means intentionally applied. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In the recent *Brower* case, the issue was whether a high speed chase which ended in a crash constituted a seizure in violation of the Fourth Amendment. The police had employed a roadblock consisting of an 18 wheel tractor-trailer truck which completely blocked the two-lane road on which the fleeing driver was traveling. The chase terminated abruptly when the fleeing vehicle rounded a curve in the road and rammed into the truck, resulting in the death of the driver. The Court held that a Fourth Amendment seizure occurred: "A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." *Brower*, 489 U.S. at 596, 109 S.Ct. at 1381 (citations omitted).

In reaching that conclusion, the Court emphasized that a governmental seizure requires an intentional acquisition of physical control. A seizure does not occur, said the Court, whenever there is a governmentally caused termination of an individual's freedom of movement, nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement, but only when there is a governmental termination of freedom of movement through means intentionally applied. (The concurring opinion, while joining in the judgment of the Court, disagreed with the majority's emphasis on the need for an intentional acquisition of physical control. *Brower*, 489 U.S. at 600–01, 109 S.Ct. at 1383–84.)

Thus, the Court noted, while the roadblock used by the County of Inyo resulted in a seizure, a police automobile chase in which the suspect unexpectedly loses control of his or her car would not be a sei-

---

**4.** The record reflects that the Government stipulated that it assumes responsibility for the care of suspected aliens taken into custody or detained by the Border Patrol. The exact authority under which the Department of Justice found the Government responsible for such care does not appear in the record.

zure. *Id.* at 595, 109 S.Ct. at 1381. The analogy is apt. The INS pursuit of the fleeing vehicle which ended in the crash was insufficient to place the aliens in INS detention; to the extent the Claims Court's holding is to the contrary it is incorrect as a matter of law.

INS activity after the crash also fails to constitute a detention of the hospitalized aliens. That a Border Patrol agent was present at ECCH when the aliens were admitted was insufficient to place the aliens in INS detention. The understanding of both the hospital and the Border Patrol was that at the termination of each alien's hospitalization, ECCH would contact INS so that *at that time* INS could take custody of the individual aliens. The events here appear insufficient to constitute the Government's having "detained" the aliens either prior to or during their hospitalization. *Brower,* 489 U.S. at 596, 109 S.Ct. at 1381.

Because the aliens were not detained by the INS, § 249 does not provide authority for, much less create responsibility in, the Government to provide care for the aliens. Nor have the parties pointed to other statutory or regulatory language imposing such authority or responsibility. Because the Government was not required to provide care to the aliens, the care provided by ECCH benefited the aliens, not the Government. Therefore, the Government received no consideration to support an implied-in-fact contract.

### D.

The dissent would find that custody and responsibility for the care and treatment of the aliens was taken by the Government at some undefined time after they arrived at the hospital, but before they were released into Government hands. *Brower* is said to be inapplicable on the facts, and dictum anyway. However, no alternative authority—either statutory or case—is offered for this contrary conclusion. That of course was the trial court's problem as well. Even if that problem were overcome, the dissent offers no basis for concluding that an application for reimbursement was ever filed with or approved by the Public Health Service in accordance with § 249.

Authority is offered for the dissent's conclusion that a contract remedy lies. The two cases cited are *Silverman v. United States,* 230 Ct.Cl. 701, 679 F.2d 865 (1982) and *Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705 (1978). *Silverman* was discussed above.

The *Philadelphia Suburban* case was one where again the Government received a direct benefit—the Government took and used plaintiff's firefighting foam to put out a fire on two ships that had collided. When the plaintiff sued to make the Government pay for what it took, the Government moved for summary judgment on the grounds that it had not contracted for what it took and therefore could not be made to pay. Not surprisingly, the court denied the Government's motion, and sent the case back for trial to see if plaintiff could develop "proof of a contract implied-in-fact arising from the totality of the circumstances." *Philadelphia Suburban,* 217 Ct.Cl. at 707.

In the case before us, ECCH had the opportunity to make its proof that the Government, given the totality of the circumstances, contracted, if not formally at least in fact, for the goods and services involved, and that these goods and services were for the benefit of the Government. In this, ECCH failed.

If this suit was against a party other than the Government, a court might sympathetically respond to the siren call of restitutionary relief, a contract "implied in law" as the euphemism goes. But, as the Claims Court recognized, the Government has long been held immune from such claims for relief. *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983) (citing *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925)). Even when as harsh a result is called for as this seems to be, it is not for us to reverse that long standing doctrine. The alluring umbrella of "totality of the circumstances" and an implied-in-fact contract when the law does not permit it is not a satisfactory alterna-

tive to an absence of legal right. If a remedy is to be had in cases such as this, it must be provided by a branch of government empowered to grant it.[5]

### III. Jurisdiction

The Government argued that ECCH failed to file its claim pursuant to the requirements of the Contract Disputes Act (CDA). As a result, the Claims Court, in the Government's view, was without jurisdiction to hear the case. In view of the fact that we conclude that no contract existed between the Government and ECCH, it is unnecessary for us to determine whether a claim for breach of that alleged contract was properly filed. The Claims Court is thus without jurisdiction under the CDA count. Of course, jurisdiction still attached under the § 249 count.

### IV. Conclusion

However compelling the hospital's claim may be, neither the Claims Court nor this court has been presented with a legal basis for relief. The judgment of the Claims Court is reversed.

REVERSED.

RICH, Circuit Judge, dissenting.

The question posed by this suit, which went to trial before Claims Court Judge Turner, sitting in San Diego near where the events occurred, is whether the costs of hospital treatment of 14 indigent, illegal aliens shall be borne by the local municipal hospital (ECCH), unfortunately located near the U.S. Mexican border, or by the U.S. Immigration and Naturalization Service (INS) which was effectively in charge of those injured aliens (whatever legal label is stuck on their status) during and after their hospitalization. It is undisputed that as they left the hospital they went directly and involuntarily into INS "custody."

Judge Turner, after a post-trial oral opinion from the bench pointing out the many problems in reaching a decision on the sole

question of who pays, wrote an extensive opinion and then a second opinion answering the government's arguments in support of its motion for reconsideration. He decided on the basis of extensive reasoning that INS should pay and adhered to that decision on reconsideration, adding supporting authority to his original opinion. I agree with his decision and to the reasoning in support of it.

As would be expected, government counsel raise every conceivable reason and legal argument against payment by the INS, which is their duty to their client and the public fisc, but I am not impressed. The reasoning of the majority does not convince me either. It states the factual background in skeletonized form but the flesh is to be found in Judge Turner's opinions and in the evidence. There are essentially no disputed facts. The government's Reply Brief states on page 2 that "we have taken care to limit our challenges to the legal determinations that the Claims Court made based upon its factual findings." These determinations, it says on the next page, "this court is free to review *de novo*." It then recites the three legal conclusions it chooses to attack, which are, briefly: (1) de facto custody of the aliens by INS; (2) the existence of an implied-in-fact contract that INS would pay; and (3) that, assuming applicability of the Contract Disputes Act (CDA), its provisions were complied with. My opinion is that on all three, Judge Turner's holdings are supported by the evidence and legally correct.

Most of the essential facts and many of the legal points are covered by the stipulations of the parties. Paragraph 2 of the stipulation reads:

2. Defendant, United States of America, through the Immigration and Naturalization Service ("INS") is responsible for the care of individuals taken into custody or detained by the United States Border Patrol as suspected aliens.

---

5. Congress has established a variety of Federal programs providing financial assistance to hospitals. If there is to be a special program of relief for a hospital that provides services under

the circumstances of this case, the Congress is in the best position to determine the nature of such a program, and its boundaries.

The majority would escape Judge Turner's conclusion on custody or *de facto* detention, as I read its opinion, by reliance on the Supreme Court decision in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Apparently it turns to *Brower* and its ilk because it can find no case on a fact situation like that here. While I can agree that *Brower* has a bearing on whether the aliens were taken into custody or detained as of the moment the van crashed or solely as a result thereof, and that the crash did not create custody according to *Brower* dictum, that is unimportant. It was the subsequent INS conduct through the actions of numerous INS personnel that shows the custody or *de facto* detention through a continuing pattern of behavior. INS's behavior speaks more loudly than its counsel's words. Agent Hernandez was sent to the hospital before the ambulances with the aliens arrived, in effect saying "Be on notice these people are illegal aliens whom we, INS, are pursuing." Later, INS sent its photographers who took their pictures, signing some hospital forms in connection therewith on behalf of the aliens. INS sent its doctor to check on the aliens' condition, health, and the treatments the hospital was providing them. One alien who was well enough to walk out and did so surreptitiously was said to have "escaped." One escapes *custody*, not a hospital. All this and more the majority describes with the single word "insufficient" with no support for that legal conclusion other than a citation to *Brower*.

I find *Brower* about as far afield from the factual situation of this case as one could get. That case involved a wrongful death action brought by the administrator and heirs of the deceased, one William Caldwell, on the legal theory that the Fourth Amendment prohibition of unreasonable seizures had been violated by a roadblock set up by the Inyo County police, against which Caldwell crashed to his death. The question was whether the complaint stated a claim. The district court held it did not and the Ninth Circuit affirmed by a divided court. The Supreme Court majority, after much discussion of

other cases, hypothetical situations, the Fourth Amendment, and what is or is not seizure, reached the following decision:

> The complaint here sufficiently alleges that respondents, under color of law, sought to stop Brower [i.e., Caldwell] by means of a roadblock and succeeded in doing so. That is enough to constitute a "seizure" within the meaning of the Fourth Amendment.

I don't know how this helps either the government or the majority, considering what they make of other statements in *Brower* about what is *not* seizure, which are, of course, dicta. The Court continued:

> Accordingly, we reverse the judgment of the Court of Appeals and remand for consideration of whether the District Court properly dismissed the Fourth Amendment claim on the basis that the alleged roadblock did not effect a seizure that was "unreasonable."

Four justices joined the judgment but declined to join the majority opinion because, inter alia, there was too much dicta in it seemingly "designed to decide a number of cases not before the Court and to establish the proposition that '[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control'."

The present case does not involve seizure, unreasonableness, wrongful death, or the Fourth Amendment and the question is not the sufficiency of a complaint to state a case. It involves who shall pay hospital bills. *Brower* is no support for the government or the majority.

Respecting the majority's point "C", I of course agree there was no express contract, a point neither side argues, discussion of which is therefore superfluous. The majority accepts the INS argument that nobody involved in this case from INS had any authority to contract or at least that the hospital should name someone specifically. This is a convenient screen for the government to hide behind. As a legal proposition, I find ECCH's "institutional ratification" approach, as developed in Judge Turner's second written opinion on reconsideration, 17 Cl.Ct. at 797–798, more persuasive, including the Court of Claims

decision in *Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982). That case is, of course, a binding precedent in this court.

I also agree with Judge Turner's conclusions about CDA compliance and its applicability.

Of course I agree with the majority that the hospital's case is "appealing," which I take to mean that the Claims Court's judgment appeals to one's sense of justice. I depart from the majority in my inability to see any clear legal necessity for reversing the Claims Court's judgment. The stated reasons seem to me an heroic effort by the majority to support the government's refusal to pay. An equally plausible rationale can be presented in favor of supporting the decision of the Claims Court. The opinions of Judge Turner constitute such a rationale and cite authority in support of his conclusions, not only in *Silverman*, just mentioned, but also *Philadelphia Suburban Corp. v. United States*, 217 Ct.Cl. 705 (1978), and many other sources of "law."

As the majority opinion says, "the Border Patrol, in the apparent lawful exercise of its authority, set in motion a chain of events which imposed significant costs upon the hospital. There can be little question but that these are costs incurred as a natural and foreseeable consequence of the conduct by the United States Government...." It goes even further in saying that "[a]s a matter of equity, there is good argument that these costs should be assessed against all the taxpayers of the United States." It then concludes, in effect, that the government, and we, are helpless because the legislators failed to foresee an emergency situation such as this and make a statutory provision for it with the result that there is no "law" under which we can affirm the Claims Court. Other courts have not been so helpless. I cannot agree that this case "is not one in which emergency action [had to] be taken by government agents to protect life...." Clearly it was, and it should be treated accordingly. Of course, the government (INS at least) was benefitted by the hospital's care of its detainees.

I would hazard the guess that the government has expended, in fighting this claim, many times the amount of assets that it would have taken to pay this claim. So much for the federal expenditures which so concern the majority.

I would affirm the judgment.