**ADVANCED TEAM CONCEPTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–197.**

United States Court of Federal Claims.

Sept. 28, 2005.

Charles H. Steen, Dallas, Texas, for the plaintiff.

Steven Mager, Trial Attorney, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Peter D. Keisler, Assistant Attorney General, United States

Department of Justice, Washington, D.C., for the defendant.

### OPINION and ORDER

SMITH, Senior Judge.

### INTRODUCTION

This case arises from a contract dispute between a management consulting group, Advanced Team Concepts ("ATC"), and the national customer service training facility for the Immigration and Naturalization Service ("INS"), the Leadership Development Center ("LDC"). ATC alleges that implied-in-fact contracts existed between itself and LDC and as a result of LDC's cancellation and termination of ATC's alleged implied-in-fact contracts for the 2001 and 2002 sessions, ATC lost profits in the amount of $602,000. Defendant cross-moved for summary judgment asserting that ATC cannot establish implied-in-fact contracts between LDC and ATC because neither Director Lee nor Langton had authority to bind the government to a contract, or in the alternative that the terms of the alleged contract were ambiguous. Defendant further argues that if the Court finds implied-in-fact contracts existed, the *Christian* [1] Doctrine mandates the inclusion of a termination for convenience clause. Therefore the government argues that ATC's claim must fail.

Both parties seek summary judgment. After briefing and oral argument, the Court GRANTS partial summary judgment for Plaintiff for 2001 sessions and GRANTS partial summary judgment for Defendant for 2002 sessions.

### DISCUSSION

#### Factual Background

LDC is a management training center that provides training to the INS. Pl.App. 273, 278. ATC is a management consulting firm and had, since 1996, trained INS personnel in writing and customer relations skills at LDC. *Id.* at 299–300. Jennifer Lee was the director of the LDC for the first five years of ATC's interactions with LDC. *Id.* at 273.

Although not a warranted contracting officer, Director Lee was the point person for scheduling ATC courses, instructors, and paying invoices. *Id.* at 302, 312–14. As part of her duties as Director, she scheduled and paid teachers for the many classes conducted there. Director Lee researched the appropriate way to exercise authority to hire contractors for LDC courses in compliance with federal law, and in March 1996 wrote a memo to her supervisor, Vance Remillard, about her conclusions. *Id.* at 356–357, 401. On April 23, 1996, Director Lee also spoke on the phone with procurement officer Art Cooper about the use of SF–182s to pay contractors and the federal limit on small purchases. *Id.* at 357, 403. In both instances, she was authorized to proceed as planned. *Id.* at 357–358, 403.

To secure training services, Director Lee's practice was to circulate a tentative schedule of classes to the various vendors for training services prior to the fiscal year. *Id.* at 102, 302–03. ATC was always among those vendors. *Id.* at 302–03. Once ATC received the proposed course schedule, ATC would reserve instructors for those dates throughout that year. *Id.* at 98–102. After the course was completed, ATC received payment by submitting an invoice to Director Lee for payment. *Id.* at 102, 313. Director Lee then completed an internal government form SF–182 to request payment for services. *Id.* at 310, 347. The form contained the same information as the ATC invoice and was signed by Director Lee. *Id.* at 349. During Director Lee's tenure, classes were occasionally canceled due to weather and other reasons, which she would reschedule. Additionally, sessions were canceled for lack of participation, and in these instances it was her practice to schedule replacement sections. *Id.* at 341–42.

On November 3, 2000, Director Lee retired from LDC, started teaching for LDC, and was replaced by Lyle Langton. *Id.* at 273, 304, 307, 432. Three weeks later, Director Langton informed ATC that it would be terminated from teaching the seven remaining writing classes on the schedule. *Id.* at 131, 367. LDC did not cancel the classes, only

---

1. *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418 (1963).

ATC's participation in them.[2] *Id.* at 129, 131. In addition, Director Langton canceled another eight scheduled sections, without rescheduling them as his predecessor had done. Pl. Compl. ¶ 134, App. 126. In June 2001, Director Langton circulated the class schedule for teaching year 2002, prefacing it with an email message informing the vendors that LDC was assessing its courses with the potential to result in changes to course content and delivery. Pl.App. 429. Director Langton informed the vendors that he would contact each as he finished the review. *Id.* In September 2001, Director Langton informed ATC that LDC would not be utilizing its services. Pl.App. 99, 131, 156, 425

### Jurisdiction and Standard of Review

The Tucker Act grants jurisdiction to this Court to hear claims arising from both express and implied contracts. 28 U.S.C. § 1491(a)(1) (2000). Here, ATC alleges that the course schedule negotiations between it and LDC created implied-in-fact contracts sufficient to invoke this Court's jurisdiction. Pl. Compl. ¶ ¶ 12, 13, 14.

Summary judgment pursuant to RCFC 56 is appropriate where there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties agree that the material facts are not in dispute and therefore summary judgment disposition is appropriate.

### Implied–In–Fact Contract

■■■ Where a Plaintiff makes a claim under an implied-in-fact contract it bears the burden of proving the same basic contract elements as for an express contract: 1) mutuality of intent to contract, 2) offer and acceptance, and 3) consideration. *Total Medical Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). In addition, when the United States is a party, a fourth element is added: actual authority of the government agent to bind the government. *El Centro,* 922 F.2d at 820; *Garza v. United States,* 34 Fed.Cl. 1, 14

(1995). Authority, either express or implied, is required to bind the United States in contract. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1432 (Fed.Cir.1998); *H. Landau & Co. v. United States,* 886 F.2d 322, 325 (Fed.Cir. 1989). Defendant's primary contention is that neither Director had actual contracting authority to bind the government in a contract. Therefore, the Court must start its analysis with the fourth element, authority to bind to the government.

### 1. Authority

■■■ In order to bind the government to a contract, the government official agreeing to the contract must possess contracting authority. *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In order to possess express authority, a government agent is granted that authority through the Constitution, a statute, or a regulation. *Garza,* 34 Fed.Cl. at 18. Apparent authority is not enough. *Fed. Crop,* 332 U.S. at 384, 68 S.Ct. 1; *El Centro,* 922 F.2d at 820. Thus, a person contracting with the federal government bears the burden of ascertaining that the agent is acting within the scope of her authority and duty. *Garza,* 34 Fed.Cl. at 18. It is undisputed that LDC's Director was not a "contracting officer" as defined by the governing FAR, namely, FAR 1.603–3. Further, if Director Lee had honestly but wrongly held herself out as a statutory contracting officer for LDC, that alone would not create contracting authority. However, it has been held that implied actual authority can satisfy the fourth element of a government contract's existence. *See H. Landau & Co.,* 886 F.2d at 322. If the authority to bind the government was central to the duties of the person holding himself out as the contracting officer, implied authority exists. *Id.* at 324, (citing J. Cibinic & R. Nash, *Formation of Government Contracts,* 43 (1982)). For the reasons set forth below, the Court finds that the Directors had implied authority to obligate LDC to guarantee payment to ATC.

---

**2.** Retired Director Lee, and her new firm, Giraffe Consultants, took over those courses. *Id.* at 307, 425.

Director Lee was founder and six-year director of America's largest INS customer service training facility, a training facility that engaged several instructional vendors. As part of her duties as Director, she scheduled and paid teachers for the many classes conducted there. As one of her many duties, Director Lee sent out proposed schedules for courses. Director Lee was given authority to hire contractors for LDC courses by both her supervisor, Vance Remillard, and the contracting officer, Art Cooper, by using the SF–182. Clearly, scheduling, hiring and paying invoices for LDC courses were central to the Director's duties. These duties were not taken away from Director Langton when he was elevated to the job. Thus, the Court finds that the Directors had implied authority to bind the government. Implied authority comes from the actual intent of the government, not the operation of law. Apparent authority is created by law based on an equitable ideal. Apparent authority, like contract-implied-in-law tells the party that justice requires that you have this authority. Implied authority is, on the other hand, created by the party's own actions and intentions.

### B. Mutual Intent to Contract

■ Having determined that LDC's Directors had implied authority to bind the government in contracts for instructional services, the Court turns to the issue of whether LDC manifested an intent to bind itself for teaching years 2001 and 2002. To find an implied-in-fact contract, the claimant must demonstrate that there was an unambiguous offer to contract upon specific terms and mutuality of intent between the parties to enter a contract. *Garza*, 34 Fed.Cl. at 14. In determining whether mutuality of intent has been established, the inquiry is an objective one. *AG Route Seven P'ship v. United States*, 57 Fed.Cl. 521 (2003). "Acceptance of the offer must be manifested by conduct, which, reviewed objectively, indicates assent to the proposed bargain." *Id.* at 536–37. Here, there is no one document reflecting a contract, but instead various documents. The Court may read all the documents together in order to find the intention of the parties. *Id.* at 536. The Court finds that for

academic year 2001 ATC and LDC had intent to contract. The Court further finds that for academic year 2002, such intent was lacking.

■ Each year since its inception, LDC would circulate a list of course offerings for the upcoming academic year. This was done in order to assure that ATC's instructors would be available and could commit their time and ATC personnel to LDC. Each year, ATC would prepare to teach the four subject matter classes. After the classes were finished, within the week, ATC would send an invoice to LDC for payment. Director Lee would then take the information provided by ATC and enter it into an SF–182 to request payment for ATC. Sometimes, however, classes would be canceled or rescheduled. Defendant asserts that this "fluidity of relationship" underscores the lack of a contract. Def. Reply Br. at 2. Defendant concedes that "while a degree of fluidity may be present in certain contracts, such fluidity as to material terms may also serve as compelling evidence of ambiguity and a lack of mutual intent." *Id.* (citing *Kelley v. United States*, 19 Cl.Ct. 155 (1989)). The Court is persuaded otherwise for academic year 2001. Prior to academic year 2001, Director Lee circulated the schedule to various vendors, as she has done since the inception of LDC. ATC was included on the circulation list. The classes taught by ATC were part of the schedule. ATC accepted the offer by Director Lee to provide these classes and scheduled its instructors to teach the courses, thereby committing its resources as done in previous years. In consideration, ATC would be paid for its services. Three weeks after Lee's retirement, the new director, Director Langton, informed ATC that ATC would not be teaching the seven remaining scheduled writing sessions for the 2001 teaching year. The writing classes were not canceled, just ATC's participation in them. In addition, another eight sections were canceled and not rescheduled. The Court finds that ATC had accepted the offer by Director Lee to provide the course instructors. The Court further finds that Director Langton breached that agreement by canceling the 2001 academic year implied-in-fact contract with ATC.

**152**

With Director Lee's retirement in 2000, the facts and circumstances surrounding the LDC–ATC relationship changed. When Director Langton circulated the 2002 year schedule, he clearly indicated that there would be a reduced course schedule, and that he would contact the vendors personally with regard to the future schedule. ATC was aware that the once firm pattern of scheduling was going to be revamped. ATC admits that it was aware that the lead administrator change signaled a likely complete elimination of courses for year 2002. This uncertainty of courses for the 2002 year was certainly an ambiguity in offer and acceptance, and therefore the Court finds no mutual intent sufficient to create an implied-in-fact contract between LDC and ATC for that year. Therefore, any expense incurred, or damage sustained, by ATC for course year 2002 is not compensable.

### The Christian Doctrine

In its cross motion for summary judgment, Defendant argues that if the Court finds actual authority and implied-in-fact contract, the Court must then also, under the *Christian* Doctrine, read in a termination for convenience clause. *G.L. Christian & Assoc. v. United States,* 160 Ct.Cl. 1, 15, 312 F.2d 418 (1963). As with any government contract, express or implied, the government enjoys the ability to terminate a contract for its convenience, absent bad faith on the part of the government. *Krygoski Const. Co., Inc. v. United States,* 94 F.3d 1537, 1541 (Fed.Cir.1996). Here, three weeks after Director Lee retired, Director Langton terminated ATC from proceeding with its writing classes. Thereafter, Director Langton replaced ATC with his predecessor Director Lee. In terminating ATC, at this point, in favor of an "inside" candidate, LDC did what presumptively government contract policy seeks to prevent; favoring contractors who have an "in," or inside knowledge not available to the general public. The Ethics in Government Act, Pub.L. No. 95–521, § 1, 92 Stat. 1824 (1978), is targeted at this practice as is the Competition in Contracting Act, 41 U.S.C. § 253 (2000). On the facts here it seems clear that the termination for convenience was not for the government's benefit but for that of a former employee. This is bad faith. Therefore, the *Christian* Doctrine does not apply.

### CONCLUSION

For the above reasons, the Court **GRANTS** partial summary judgment for Plaintiff for academic year 2001 and **GRANTS** partial summary judgment for Defendant for academic year 2002. The parties are **ORDERED** to confer regarding damages calculations pursuant to this Opinion and to participate in a telephone status conference to be held on **October 17, 2005 at 4:30 p.m. EDT.**

**IT IS SO ORDERED.**