# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| S. Harman & Associates, Inc. ) | ASBCA No. 60214 |
| ) | |
| Under Contract No. 000000-00-0-0000 ) | |

APPEARANCE FOR THE APPELLANT: Ms. Saundra K. Harman
President

APPEARANCES FOR THE GOVERNMENT: Col Matthew J. Mulbarger, USAF
Air Force Chief Trial Attorney
Maj Jason R. Smith, USAFR
Heather M. Mandelkehr, Esq.
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

In this appeal, brought pursuant to the expedited procedures of Board Rule 12.2[1], we consider whether appellant, S. Harman & Associates, Inc. (Harman), had a contract with the government. Unfortunately for Harman, we conclude that, although a government representative with whom Harman's principal, Ms. Saundra Harman, dealt may have had every intention of awarding a contract to Ms. Harman's company, he never actually expressly or implicitly informed Harman that such a contract was awarded. Moreover, the government representative did not possess the authority to make such a contract award, and communicated that fact to Ms. Harman. Under these circumstances, there was no contract, and we cannot provide Harman any relief.

## FINDINGS OF FACT[2]

In January 2015, Harman and Mr. Robert Chiera, the civilian training manager at Joint Base Langley-Eustis (LAFB), began discussing a proposal to have Harman conduct

---

[1] The government earlier filed a motion for summary judgment, which we deferred ruling upon, arguing, as it does now, that there was no contract because no one with authority to contract, expressly or implied, made an agreement with Harman. Its further consideration is overtaken by this opinion. The Contract Disputes Act, implemented by Board Rule 12.2, provides that this decision shall have no value as precedent, and in the absence of fraud shall be final and conclusive and may not be appealed or set aside.

[2] Harman did not file a brief in this case, although it was invited to do so. It did, however, file a document, on 20 November 2015, that appears to be a reply in response to the government's answer in this case. We will consider and address those arguments raised in the 20 November filing. For the most part, however, the facts presented by

retirement planning seminars for civilian personnel at LAFB sometime in the spring (R4, tab 3). On 23 January[3], Harman emailed to Mr. Chiera a cost "proposal" for a one-day session of the retirement training (R4, tab 3 at 1).

Mr. Chiera did not respond to the 23 January proposal until he resumed contact with Harman in an email on Monday, 2 March, in which he apologized for his lack of communication, that he explained to have been a result of indecision by his superiors (R4, tab 4 at 2). In this email, Mr. Chiera requested a cost quote for a 3-day retirement planning session for approximately 500 individuals, sometime between 16 March and 1 April (*id.*). Ms. Harman responded to the email that day, explaining that she was working on a proposal to get to Mr. Chiera as soon as possible, but noting her concern about lead time because the printers would take about a week to get the materials for the training prepared (*id.* at 1-2). She suggested that the week of 23-27 March would be the earliest that her company could perform the training, but that making that date would require a commitment by the end of the week (*id.* at 1). She further noted that, "I know this is just an inquiry" (*id.*).

Near the end of the day on 2 March, Mr. Chiera sent Ms. Harman another email explaining that, after discussing the matter further with other military and civilian managers, they had determined that the retirement seminars should be held on 24 and 25 March to coincide with a pending personnel announcement to be made at LAFB on 23 March (R4, tab 4 at 1). In this email, Mr. Chiera revised his request by stating that the seminar would be for two days, rather than three, as first indicated, but that it would still be for about 500 attendees (*id.*).

At 8:35 p.m. on 2 March, Ms. Harman provided, via email, a price quote to Mr. Chiera for two different options: a 3-day training for 500 people and a 2-day training for the same number (R4, tab 5). The 3-day option would cost $69,000, the 2-day option would cost $47,500 (*id.*). She also informed Mr. Chiera that her printers needed to be informed of the printed material counts by close of business on Thursday (5 March) if they were to guarantee the delivery of the materials on time (*id.*).

The next day (3 March), Ms. Harman sent an email to Mr. Chiera inquiring about the proportions of individuals who would be attending the training that belonged to the two respective federal retirement categories (known as CSRS and FERS), so that she could inform the printers of the numbers needed for the appropriate packages (R4, tab 7 at 1-2). She also inquired whether Mr. Chiera required a more formal proposal than the one that she had provided the earlier evening, which she had given "on an informational basis" (*id.* at 2). Mr. Chiera responded that morning that he believed that the FERS/CSRS breakdown would be approximately 85% FERS and 15% CSRS (*id.* at 1).

---

the government are undisputed in any filing, although we have also independently satisfied ourselves of their support in the record.

[3] All dates herein are for the year 2015.

2

He further wrote that he had forwarded Ms. Harman's proposal to his leadership and expected to have "a decision NLT tomorrow [Wednesday, 4 March] mid-day" (*id.*). Ms. Harman thanked Mr. Chiera for the update and noted that, if she had the information when expected, it would help expedite the printing process (*id.*).

On 4 March, in response to an email from Ms. Harman suggesting various training format options, Mr. Chiera informed her that her company's proposal had been elevated to the Major Command for funding, rather than being decided at the local LAFB level. (R4, tab 8)  He apologized and stated that, as a result, he did not expect to have a decision until the next day (*id.*).

Not having heard from Mr. Chiera earlier on that day, Ms. Harman sent him an email at 4:52 p.m. on Thursday, 5 March, expressing that she "fully underst[ood] that the decision is out of your hands," but warning him that she might have trouble accomplishing the printing if she did not get a master to them by early the next morning (R4, tab 9).

The record is devoid of any evidence that Mr. Chiera responded to Ms. Harman's email, and Harman makes no allegations in any of its filings with the Board that he did so. Nevertheless, on Friday, 6 March, Harman made airline reservations for Ms. Harman and one other Harman staff member to travel to LAFB to conduct the training (R4, tab 14).

On the evening of Sunday, 8 March, Ms. Harman sent an email to Mr. Chiera requesting a copy of the personnel announcement to be made on 23 March and asking what clearance she would need to get onto the base (R4, tab 10).  She also requested a confirmation email from Mr. Chiera stating that LAFB was contracting with Harman to provide the stated training on 24 and 25 March for the price of $47,500 (*id.*).  There is no evidence or allegation that Mr. Chiera or anybody else at LAFB ever sent such a confirmatory email to Ms. Harman or to anybody on her staff.

On 10 March, Mr. Chiera began the process of having a contracting officer (CO) award the contemplated contract to Harman by preparing a "Form 9," officially requesting the contract award and recommending that it be given to Harman (R4, tab 11).[4]  On 11 March, James Pabon (the CO assigned to this potential procurement) contacted Mr. Chiera and informed him of the need for a single source justification if, in fact, the use of a sole source was what he wanted (R4, tab 12 at 1).

Later on the 11th of March, Ms. Harman sent a proposal and invoice to Mr. Chiera for the proposed training (R4, tab 13 at 1).  The proposal was labelled as such, included price, and was written in the conditional, stating such things as the participants "would

---

[4] Because the potential contract price was greater than $25,000, it was above the regulatory threshold for use of a government purchase card by Mr. Chiera (R4, tab 1 at 32, tab 2 at 39).

3

receive" certain materials and noting that Harman was "holding March 24-25, 2015 for the seminars" (id. at 2). There was no apparent written response to this email except that, on Friday, 13 March, Mr. Chiera sent an email to Ms. Harman's assistant providing additional information about the time of the proposed training and information necessary to obtain access to the base (R4, tab 20 at 1).

On Sunday, 15 March, Ms. Harman sent an email to Mr. Chiera about her travel plans for the week after next (i.e., the week of 23 March) and notifying him that the course materials would be delivered by Thursday, the 19th, or Friday, the 20th, at the latest, and requesting that she or her staff be informed upon their receipt (R4, tab 15). Mr. Chiera does not appear to have responded directly to this email, but early the next morning, Monday, 16 March, made inquiries to Mr. Pabon to find out if the contract had been approved (R4, tab 16 at 1-2). Mr. Pabon responded to Mr. Chiera, requesting a sole source justification for review (id. at 1).

Evidently, Mr. Pabon determined that a sole-source award was inappropriate in this case because he subsequently contacted Ms. Harman that day (16 March) and informed her that the proposal needed to be competitively bid and needed to be posted for three days (R4, tab 17). Ms. Harman then sent an email to Mr. Chiera informing him of Mr. Pabon's statements to her as well as her concerns that waiting until Friday, the 20th of March, for a contract award before shipping the materials would risk their untimely arrival (id.). According to this email, Harman had already had the materials printed and committed to paying for them (id.). Ms. Harman went on to note that Mr. Pabon had requested information about other trainings that Harman had completed with large numbers of people and that her staff was assembling the information to provide the next day (Tuesday, the 17th) (id.). Earlier that day, Ms. Harman had sent to Mr. Chiera a partial list of the agencies that her company had recently worked with (R4, tab 18). On the morning of the 17th, Ms. Harmon sent Mr. Pabon an email containing the information about previous trainings that he had requested (R4, tab 22).

On Tuesday, the 17th of March, Mr. Chiera informed Ms. Harman that he would be on leave the remainder of the week and asked Ms. Harman to send him the information that he would need in order to obtain base access for her to perform the contract (R4, tab 21 at 1). When her administrative assistant responded that she was not sure what Mr. Chiera needed (see id.), he forwarded to Ms. Harman the email containing the training schedule and explanation of base access information that he had previously sent to her company on 13 March (R4, tab 20 at 1-2). As indicated by his automatic out-of-office email reply generated when Ms. Harman shipped the boxes of materials to LAFB and requested confirmation of their receipt by email (R4, tab 27), Mr. Chiera was, in fact, away from the office from the 18th until the 23rd of March (R4, tab 26). The boxes of materials arrived at LAFB on 19 March (R4, tab 27).

For reasons unexplained by the record, on the morning of Friday, the 20th of March, a government employee named Mary Bunyan sent an email to Ms. Harman

seeking clarification of what time the retirement seminar would begin on the 24th (R4, tab 31 at 12). The email trail in this message indicated that Ms. Bunyan had "registered" for the event on the morning of 16 March (*id.*). The record includes no indication that anybody at Harman responded to Ms. Bunyan, sought clarification from the government regarding Ms. Bunyan's message, or otherwise relied upon it to conclude that Harman had been awarded the contract.

The Air Force, in fact, put out the solicitation for the services, and there were two other bidders on the contract, and one of them, Economic Systems, Inc., was the lowest bid, offering to perform for $16,065.00 – approximately 1/3 the price quoted by Harman (R4, tab 28 at 8). On Friday, 20 March, the award was, in fact, made to Economic Systems, Inc. (*id.* at 1). On Monday, 23 March, Ms. Harman inquired to Mr. Chiera about the award and the status of the materials that she had caused to be shipped to LAFB (R4, tab 29 at 1-2). On 24 March, Mr. Pabon responded to Ms. Harman and told her that an "unsuccessful offeror notice" had earlier been sent to her "via GSA eBuy" and that Mr. Chiera would coordinate the return of the materials (*id.* at 1). Mr. Pabon also stated that he would follow up the email with instructions and information regarding the recovery of her expenses (*id.*).

Mr. Chiera did not ship the course materials back to Harman until 7 May (R4, tab 30). During the time that these materials were in government custody, several sets of manuals were taken out of one of the boxes which had a tear in it (*id.*). Ms. Harman later concluded that 17 manuals were missing (R4, tab 32), which the government did not dispute (R4, tab 34 at 2).

Harman subsequently filed a claim with Mr. Pabon (R4, tab 31), and then modified the claim by reducing the number of missing manuals from 75 to 17 (R4, tab 32). The components of the claim were as follows: $384.00 for 12 hours of staff time at $32.00 per hour; $400.00 as a fee for cancelling the reservations with U.S. Airways; $3,446.25.00 for printing the manuals at Staples; $633.60 for shipping the manuals; and $361.25 for the missing manuals (*id.*).

On 4 August, finding that there was no contract between Harman and the government and that Mr. Chiera had no authority to bind the government, Mr. Pabon denied Harman's claim for the most part, except that he did approve compensation for the airline cancellation fee and compensation for the 17 lost manuals, which added up to $761.25 (R4, tab 34). The basis for Mr. Pabon's making the award of the airline cancellation fee was that, when the airline tickets were obtained, Harman had believed that Mr. Chiera had the authority to approve this expense (*id.* at 3). With respect to the lost manuals, Mr. Pabon determined that the government was at fault for the loss and should pay the cost (*id.* at 2).

Harman filed a timely appeal with the Board.

5

## DECISION

The evidence before the Board makes clear that there was no contract of any sort between the government and Harman. It is undisputed that Mr. Chiera did not possess the authority to enter into a contract exceeding $25,000, and that neither Mr. Chiera nor any other government employee ever told Harman that it had been awarded a contract. Under these circumstances, Harman can receive no recovery from the Board.

We begin by noting that our jurisdiction is limited to disputes under contracts. *See* 41 U.S.C. § 7105(e)(1)(A). Thus, our basis for providing any relief to Harman is limited to the case in which the government has an express or implied contract with the company. *See Thai Hai*, ASBCA No. 53375, 02-2 BCA ¶ 31,971 at 157,919-20.

We may dispose of the question of whether the parties had an express contract quickly. Harman never alleges that there was an express contract, whether oral or written; the record is devoid of any evidence on the matter; and the government (without contradiction) denies its existence. We thus conclude that there was no express contract in this case.

We come to the same conclusion regarding the existence of an implied-in-fact contract. There are two independent bases for this conclusion: first, although it is abundantly clear that Mr. Chiera *wanted* to cause a contract to be awarded to Harman, and very likely communicated that fact to Harman, he never expressly or implicitly told Harman that such an agreement had been finalized. The second reason is that, even if Mr. Chiera had implied or told Harman that it had a contract with the government, he did not possess the authority to make such an agreement.

An implied-in-fact contract has all of the same requirements as an express contract except that its terms are proved by the parties' behavior, rather than by an explicit agreement. *See Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003); *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). These requirements include "lack of ambiguity in offer and acceptance" and that the government representative whose conduct is relied upon has "actual authority to bind the government." *E.g., City of El Centro*, 922 F.2d at 820. The requirement for actual authority of federal government representatives is different than in other commercial contexts, where principals may be bound by actions of their agents. *See, e.g., Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383-84 (1947); *Thai Hai*, 02-2 BCA ¶ 31,971 at 157,921-22. As the Supreme Court stated in *Merrill*, "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority...even [if], the agent himself may have been unaware of the limitations upon his authority." 322 U.S. at 384.

6

Turning to the facts of this case, we see that there was never an explicit or implicit unambiguous offer and acceptance prior to (or after) Harman's incurring the costs for which it seeks compensation. On 8 March, Harman specifically requested a formal notification that the contract had been approved, which was never forthcoming; on 11 March, Ms. Harman submitted a "proposal" for the contract, which indicated that it was understood by her that it had not yet been approved; and on the 16th, Ms. Harman was informed that the contract must be bid and that no decision upon the award would be forthcoming for at least three days. The boxes of materials were shipped by Harman on the 17th. Although the record does not address this point with specificity, it appears that the staff and duplication costs were incurred some time during the week of the 9th of March. There was no communication during that week that should have led Harman to believe that there was a contract award.

Harman points to an email from Mr. Chiera on the 13th of March, when he provided information to Ms. Harmon's assistant about the time of the proposed training and about access to LAFB, but that email was consistent with providing Harman information for use in the event that the contract was awarded to it. It is certainly not the unambiguous acceptance necessary to reflect a contract award. Similarly, the government's failure to respond to the email sent by Ms. Harman on Sunday, 15 March, in which she sent her travel information to Mr. Chiera, has very little import: there is no evidence that Mr. Chiera received it that day, and the next day (the 16th), which was the first workday of the week, Mr. Pabon informed Ms. Harman of the pending contract competition, which would have dispelled any ambiguity about whether the contract had been awarded to Harman.

Harman also argues that the email it received on 20 March from Ms. Bunyan somehow indicated that it had received the award. It does no such thing. At most, it reflects internal government confusion on or before 16 March, when Ms. Bunyan "registered" for the course, about the contract award. Although this confusion is consistent with Mr. Chiera's wishful thinking that he could direct the award to Harman, this email is not evidence that there was an actual award made to Harman or that news of an award was communicated to Harman prior to the email on the 20th, at which time Harman was aware that it needed to await an award decision. Certainly, Harman's email to Mr. Pabon on 23 March, inquiring about the status of the award, dispels any reasonable belief that the 20 March email misled Harman.

We thus conclude that Harman had no reason to believe that it had received an actual contract award from the government before it incurred the costs that it seeks to recover here, and that there was, in fact, no unambiguous offer and acceptance, whether explicit or implicit, that would have been a necessary prerequisite to forming such a contract.

Moreover, even if we had judged Mr. Chiera's actions to constitute an unambiguous acceptance of Harman's contract offer, they would be insufficient to bind the government because Mr. Chiera did not possess the authority to agree to Harman's

offer. To be sure, he was able to use his government purchasing card to make purchases up to $25,000.00, but that was the limit of his authority (*see* footnote 4). Likely, that limit was ample for Mr. Chiera's usual needs (which would explain his relative unfamiliarity with proper contracting protocol), but it was not enough to allow him to commit to the contract at issue here, which was proposed to cost $47,500.00. Accordingly, it was legally impossible for Mr. Chiera to agree to the contract – whether expressly or impliedly. *See Merrill*, 322 U.S. at 384; *Thai Hai*, 02-2 BCA at 157,921-22. And it makes no analytic difference that the claim is for a lesser amount that is within Mr. Chiera's authority: we can only afford Harman relief if there was a contract, and the only potential contract here was for $47,500.00 – a contract that was not within Mr. Chiera's authority to award. Although this may be a hard result for Harman, it was not as if Harman was completely misled by Mr. Chiera: on more than one occasion, and as early as 5 March, Ms. Harman explicitly recognized that she "fully underst[ood]" that the contract decision was "out of [Mr. Chiera's] hands," because of the amount of money involved.

## CONCLUSION

For the reasons stated herein, we dismiss the appeal for lack of jurisdiction.

Dated:  3 February 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60214, Appeal of S. Harman & Associates, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals