ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Guardian Safety & Supply LLC | ) | ASBCA No. 61932 |
| d/b/a Enviro Safety Products | ) | |
| | ) | |
| Under Contract No. F3J6AF8152GW01 | ) | |

APPEARANCE FOR THE APPELLANT:        Ron R. Hutchinson, Esq.
                                     Doyle & Bachman, LLP
                                     Arlington, VA

APPEARANCES FOR THE GOVERNMENT:      Jeffrey P. Hildebrandt, Esq.
                                       Air Force Deputy Chief Trial Attorney
                                     Lt Col Damund E. Williams, USAF
                                       Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

Guardian Safety & Supply LLC d/b/a Enviro Safety Products (Enviro Safety or appellant) was the recipient of an order placed by the United States Air Force (USAF) for 500 3M Versaflo masks and components for use by children at Osan Air Force Base, South Korea. The USAF used a Military Interdepartmental Purchasing Request (MIPR), No. F3J6AF8152GW01, to purchase the masks and components directly from Enviro Safety. The USAF argues that a MIPR is typically used only as an internal funding document with the Department of Defense and a contract was never formed. Appellant alleges that it had an implied-in-fact contract and seeks reimbursement for a restocking fee in the amount of $57,536.10, incurred after the USAF terminated the alleged contract for convenience of the government. Appellant elected to proceed under Board Rule 12.2,[1] Expedited Procedures, and both parties have elected to waive a hearing and submit their cases on the written record pursuant to Board Rule 11. Both entitlement and quantum are at issue. By all accounts, MIPR No. F3J6AF8152GW01 was intended by the parties to be a contract and was subsequently ratified by the actions of government personnel with authority to contract. We sustain the appeal.

---

[1] A decision under Board Rule 12.2 shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

## SUMMARY FINDINGS OF FACT

1. Enviro Safety is a small business (8a) contractor. Its principal business focus is the sale of safety equipment. (App. br., ex. A, McCarty decl. ¶ 1)

2. In January 2018, Maj Steven Tang, 51 Aerospace Medical Squadron Bioenvironmental Engineering Flight Commander, made inquiries to Enviro Safety concerning a government purchase of approximately 500 PAPR masks for use by Osan Air Force Base, South Korea (R4, tab 1 at 5, tab 2 at 4-5). Enviro Safety responded with specific information provided by 3M Technical Services identifying a specific hat size and documentation identifying the official CDC statistics for children as early as 24 months. Further discussion took place between the parties to identify the proper PAPR system and cartridges (blower/battery/CBRN filter) to protect against chemical gases. (R4, tab 2 at 1-4) Maj Tang made no commitment to Enviro Safety on behalf of the government to purchase masks of any type or quantity as a result of that exchange (R4, tab 2 at 1).

3. On March 14, 2018, MSgt Jacqueline Crimmins, with Air Force Non-Combatant Evacuation Operations (NEO), Osan Air Force Base, South Korea requested a quote from Enviro Safety for 500 each of 3M TR-600-ECK PAPR with the TR-6530N cartridge and 3MMS-403S hood, ages 2-10, to include a separate line item for expedited shipping. A quote was provided on March 16, 2018 in the amount of $668,191.25, to include expedited shipment. (Gov't br. at 2; R4, tab 3 at 1, tabs 4, 19 at 3)

4. On May 17, 2018, MSgt Christopher Starnes, Air Force Superintendent, Services and NEO Operations in South Korea, inquired whether Enviro Safety would accept a "MIPR or DD Form 448" for purchase of the quoted items. In response, Mr. Maly, sales manager at Enviro Safety, stated that they had never used a "MIPR" before and required more information. SSgt Blythe responded that same day with the following statement:

> This is a form that will allow the AF [Air Force] to send funding to all DoD agency for payment of items. If you are then we can provide that to you and payment can be quick to execute. If not then it will be a 3-4 month process to get funding issued. Also, are you the only provider that supplies these mask? I was told that you were according to individuals I spoke to.

(R4, tab 19 at 2-3)

5. A MIPR is a Military Interdepartmental Purchase Request. It was (and is) a required document by which one military department or DoD agency requests another military department or DoD agency to purchase material or services for the requesting department or agency's use. A MIPR or DD Form 448 is the acquiring department's authority to acquire the supplies or services on behalf of the requiring department. (*See* app. supp. R4, tab 34)[2] It is not normally used to procure services or supplies directly from a private company or source (R4, tab 29 at 3).

6. Based upon the representations made by the government, Mr. Maly advised SSgt Blythe that Enviro Safety would accept the MIPR and DD Form for purchase of these items (R4, tab 19 at 1-2; app. br., ex. A, McCarty decl. ¶ 5, ex. B, Austin decl. ¶ 3). On May 30, 2018, SSgt Blythe requested confirmation of the quoted price and asked for certain contact information to be able to send the MIPR. The quote was confirmed and the requested contact information was provided. (R4, tab 22 at 1-2)

7. On June 4, 2018, SSgt Blythe, with copy to MSgt Christopher Starnes, USAF PACAF 7 FSS/A1 and SSgt Wright, USAF PACAF 7 AF/FM, notified Enviro Safety that the MIPR was provided electronically (R4, tab 18 at 9). MIPR No. F3J6AF8152GW01 was issued to Austin Maly of Enviro Safety for 500 each of the masks and associated components in the amount of $668,191.25, including expedited shipment. Block 13 provided for invoicing to DFAS LI DEAMS, 27 Arkansas Rd, Limestone, ME. The supplemental accounting classifications in six specific amounts for an accounting line total of $668,191.25 was provided on page two of the MIPR. The MIPR provided the following certification signed by SSgt Blythe: "I certify that the goods acquired under this agreement are legitimate, specific requirements representing a bona fide need of the fiscal year in which these funds are obligated. Required reviews are complete." (R4, tab 6) The decision to use a MIPR as a contract document was made by respondent (*id.*)

8. MIPR No. F3J6AF8152GW01, was authorized by SSgt Dylan Goodwin, Air Force resource advisor, and certified on June 4, 2018, by SSgt Tiara Wright. There was a clear intention by SSgt Wright, contract specialist and the others who prepared and approved the MIPR to obligate the funds and acquire the goods identified. (R4, tab 6 at 1, tab 33, ¶ 5; gov't br. at 4)

9. On June 5, 2018, Mr. Maly acknowledged receipt of the MIPR and notified SSgt Blythe, MSgt Starnes and SSgt Wright, that the two-page MIPR was received; however, it did not include the "delivery schedules, preservation and packaging

---

[2] By letter dated April 4, 2019, the government objected to the admissibility of Air Force Instruction 65-118, which appellant submitted into the supplemental Rule 4 file as tab 34, and the government's responses to appellant's interrogatories, which appellant submitted as tab 35. The government's objections are overruled and the documents are admitted into evidence.

instructions, shipping instructions" as referenced. He asked whether there was "anything else that I will need other than the information on this MIPR?" (R4, tab 18 at 8-9) MSgt Starnes confirmed a "NLT July 7, 2018" as the delivery date. SSgt Wright, contract specialist, was copied on this email. (R4, tab 18 at 7)

10. Enviro Safety accepted the MIPR as the contract document in reliance upon representations made by SSgt Blythe in an email dated May 17, 2018 (R4, tab 19 at 2; app. br., ex. A, McCarty decl. ¶ 5, ex. B, Maly decl. ¶ 3). Enviro Safety understood that the MIPR formed a contract between the Air Force and Enviro Safety for the purchase of the masks and components for a total fixed price of $668,191.25 (app. br., ex. A, McCarty decl. ¶ 6, ex. B, Maly decl. ¶ 4). Enviro Safety began production immediately after the order was placed to allow sufficient time to meet the accelerated delivery date (R4, tab 9 at 4, tab 18 at 7).

11. SSgt Nguyen, as a contract specialist and the one who approved the MIPR as "contract review" on June 3, 2018 (app. supp. R4, tab 35 at 3), should have identified that the use of a MIPR to purchase the masks and components from a private company would be problematic. On or about June 19, 2018, Enviro Safety submitted an invoice to the DFAS office as identified in Block 13 of the MIPR. DFAS rejected the invoice because it did not include a contract number. Mr. Maly notified MSgt Starnes of the issue, copying SSgt Blythe and SSgt Wright on the correspondence. (R4, tab 18 at 5-6)

12. On or about June 20, 2018, this MIPR transaction was identified by Maj Trevor Chambers, Deputy Chief of Contracting in the Osan Regional Contracting Office (RCO), and Mr. Joe Smithey, Deputy Chief of the RCO, as an unauthorized commitment and proceeded to collect the facts involved in the UAC (R4, tab 9 at 9-11, tab 18 at 2-4).

13. On June 20, 2018, Mr. Smithey advised Enviro Safety that "[i]t appears that a non-binding contractual agreement was entered between your company and a member of the U.S. Air Force here in Korea. They sent you a Military Interdepartmental Purchase Request.... It cannot be used to pay a civilian private business for goods and services received." Mr. Smithey advised appellant to stop all work on the project. (R4, tab 9 at 10-11)

14. On June 20, 2018, Mr. Smithey again advised Mr. Maly that:

> [A]ll work needs to be stopped and then we will proceed with the proper contract actions. I just wanted to give you a heads up due to the cost of this unauthorized commitment. We will work with you in getting paid for the items that are completed. However, the procurement of the remaining

4

items will be processed in accordance with Federal
Regulations.

(R4, tab 9 at 9) That same evening, Mr. Maly advised that he would check the status of production when he returned to work the next day, however they were working on an estimated ship date of June 26 to meet the delivery deadline of July 7. Mr. Smithey again advised him that "[w]e will not leave you on the hook for errors caused by Government personnel." (R4, tab 9 at 8-9)

15. On June 21, 2018, Mr. Maly responded: "We do have access to working with a GSA reseller, if this would make the MIPR useable. What steps are necessary for beginning the contract? Our issue here is that we have already begun work on, and completed about $200,000 of the order which is [sic] non-returnable items." (R4, tab 9 at 10)

16. On June 21, 2018, Maj Chambers advised Enviro Safety that he should:

> [N]ot take further action and nor ship these items pending resolution of the ratification procedures.... As indicated before by Mr. Smithey, MSgt Starnes lacked any authority on behalf of the US Government to enter into a contractual agreement with your company. I understand the predicament that this places your company in and we will work quickly to resolve it under the authorities provided and we have already initiated the investigation.

Maj Chambers also inquired whether any of the items were returnable to 3M. 3M had advised Enviro Safety that the items are non-returnable. (R4, tab 9 at 2-3)

17. The high dollar amount associated with this action (potentially $668,191.25) required approval beyond the RCO and government personnel were concerned about the need to go to headquarters for approval. Throughout discussions with Maj Chambers and Mr. Smithey, Enviro Safety was given assurances that they would be compensated for the work they had completed: "[w]e will work with you in getting paid for the items that are completed"; "[w]e will not leave you on the hook for errors caused by Government personnel"; "I understand the predicament that this places your company in and we will work quickly to resolve it under the authorities provided." (R4, tab 9 at 3, 8-11, tabs 14, 16-17)

18. Maj Chambers immediately stepped in to begin negotiations directly with 3M for a return of the masks and components. 3M ultimately agreed setting a restocking fee at $95,000. (R4, tab 33 at 1) The government proceeded with ratification of the UAC at the local level, due to the fact that the amount in question was below $100,000 pursuant

to the Federal Acquisition Regulation (FAR) 1.602-3, Ratification of Unauthorized Commitments, for the restocking fees (R4, tab 7).

19. Maj Chambers was subsequently replaced by Lt Col Warren as the Chief of the RCO, and the contracting officer (CO) now responsible for processing the UAC request (app. br. at 12-13; gov't br. at 7; R4, tab 33). On September 7, 2018, Lt Col Warren, began his negotiations with 3M to try and eliminate or reduce the restocking fee of $95,000.00 (R4, tab 24 at 3). As a result of those negotiations, on or about October 18, 2018, 3M advised Enviro Safety that they could return the completed items with a restocking fee to $57,536.10 (R4, tab 26 at 1). Both Maj Chambers and Lt Col Warren were COs with the authority to ratify this unauthorized contract action (*see* R4, tab 33, tab 35 at 5-6).

20. Enviro Safety returned the items and paid 3M the sum of $57,536.10 for the restocking fee negotiated between 3M and Lt Col Warren (R4, tab 24 at 2-3; app. br., ex. A, McCarty decl. ¶ 5, ex. B, Maly decl. ¶ 5).

21. On October 19, 2018, Lt Col Warren advised Enviro Safety that he would not recommend ratification of the UAC because he determined that the government had received no benefit from the restocking fee (R4, tab 27 at 1-2).

22. On October 31, 2018, Enviro Safety filed a claim in the amount of $57,536.10 with the CO to recover the restocking fees it paid to 3M, the amount of which was obtained by direct negotiations between the CO and 3M (R4, tab 28). The claim was denied on December 10, 2018 (R4, tab 29). On January 8, 2019, Enviro safety timely filed a notice of appeal with the Board, which was docketed as ASBCA No. 61932.

## DECISION

Our jurisdiction arises from the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109, where, as here, an implied-in-fact contract has been alleged. *Reynolds Shipyard Corp.*, ASBCA No. 37281, 90-1 BCA ¶ 22,254 at 111,827; *Choe-Kelly, Inc.*, ASBCA No. 43481, 92-2 BCA ¶ 24,910 at 124,221. Appellant bears the burden of establishing the Board's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Total Procurement Service, Inc.*, ASBCA No. 53258, 01-2 BCA ¶ 31,436 at 155,237. Nevertheless, the claimant only needs to allege that either an express or implied-in-fact contract exists. Whether such a contract was formed goes to the merits of the appeal. *American General Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,640. The pleading of a valid implied-in-fact contract is generally sufficient to support jurisdiction. *Total Medical Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir.), *cert. denied*, 522 U.S. 857 (1997); *see also Protecting the Homeland Innovations, LLC*, ASBCA No. 58366, 13 BCA ¶ 35,398 at 173,671.

6

Appellant has consistently maintained that it had a contract with the respondent in the amount of $668,191.25, to provide the 500 masks and components to the USAF in South Korea, and that order was placed only after obtaining the requisite approvals through the contract chain. Unfortunately, MIPR No. F3J6AF8152GW01 was not the proper documentation to be used by the government to place an order with appellant. A MIPR is typically used only as an internal funding document within the Defense Department, but, as appellant maintains here, it was used as a contract document issued directly to Enviro Safety with authorization and certification by appropriate Air Force officials. Specifically, appellant argues that it had an implied-in-fact contract with the government upon the issuance of the MIPR on June 4, 2018. (Finding 8; app. br. at 15-17) In the alternative, appellant argues that the government ratified the agreement (app. br. at 15-17).

A binding contract with the United States, whether express or implied-in-fact, requires that the government representative who entered or ratified the agreement had actual authority to bind the United States. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). One who enters into an agreement with the government assumes the risk of ascertaining the authority of the agents who purport to act for the government. This risk remains with the contractor even when the government agents themselves may have been unaware of the limitations of their authority. *Id.*; *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). The party alleging a contract must show "a mutual intent to contract including an offer, an acceptance, and consideration." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir. 1998) (quoting *Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)).

Enviro Safety bears the burden of proving the existence of an implied-in-fact contract. *Altanmia Commercial Mktg. Co.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095 at 168,584. The government's attempt to brand the use of the wrong documentation as fatal to appellant's allegation of the existence of a contract is misplaced. Here, the MIPR itself is evidence that supports the conclusion that an implied-in-fact contract between the government and appellant may exist. An implied-in-fact contract is founded upon a meeting of the minds and "is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)); *see also Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) ("A contract implied in fact is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties."). The requirements for an implied-in-fact contract with the United States government "are the same as for an express contract; only the nature of the evidence differs." *Hanlin*, 316 F.3d at 1328; *see also Trauma Serv. Grp.*, 104 F.3d at 1325. The elements of proof to establish a valid contract with the government are: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and

acceptance; (3) consideration; and (4) actual authority on the part of the government representative to bind the government in contract. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003); *City of El Centro*, 922 F.2d at 820.

Appellant argues that it has met all the elements to establish such an implied-in-fact contract. We turn first to the mutuality of intent and the unambiguous offer and acceptance between Enviro Safety and the government. Mutuality of intent is essential to the formation of a contract with the government. *Walsh Constr. Co. of Ill.*, ASBCA No. 52952, 02-2 BCA ¶ 32,024 at 158,279, *aff'd*, 80 F. App'x 679 (Fed. Cir. 2003). To satisfy its burden to prove mutuality of intent, Enviro Safety must show, by objective evidence, the existence of an offer and reciprocal acceptance. *Anderson*, 344 F.3d at 1353; *Yonir Technologies Inc.*, ASBCA No. 56736, 10-1 BCA ¶ 34,417 at 169,897. Once an offer is made, for a contract to be formed there must be an acceptance of the offer. *Anderson*, 344 F.3d at 1355. "It is essential that 'acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain.'" *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237 (quoting *Russell Corp. v. United States*, 537 F.2d 474, 482 (Ct. Cl. 1976)). Enviro Safety presents detailed evidence to support a finding that there was mutuality of intent. The email communication between the parties was vast, leading up to the issuance of the MIPR and thereafter. On June 4, 2018, when SSgt Blythe provided MIPR No. F3J6AF8152GW01 to Enviro Safety he did so with the intent of acquiring the 500 masks with components, with expedited shipping at a cost of $668,191.25. His order was specific, leaving no detail of the acquisition to speculation. A contract is unenforceable unless it is sufficiently definite so as to provide a basis for determining the existence of a breach and formulating an appropriate remedy. *Crewzers Fire Crew Transport, Inc. v. United States*, 741 F.3d 1380, 1382 (Fed. Cir. 2014); *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir. 1991). There were clearly defined terms over what was to be provided; the standards required for the production and agreement over the delivery date (gov't br. at 45-46).

We find the parties' agreement sufficiently definite. It is obvious from the internal and external communication that occurred before, during and immediately after the issuance of the MIPR that everyone involved in the transaction on behalf of the government presumed they were entering into a contract with Enviro Safety to purchase the items identified in the MIPR (findings 4, 6-10). On June 5, 2018, when Mr. Maly acknowledged receipt of the MIPR on behalf of Enviro Safety, his intention was to enter into a contract with the USAF to supply the items requested. There was no intention or discussion of preparing other documentation. Why would there be when they intended the MIPR to be the document that constitutes a contract? (Findings 7-9) In the same correspondence, he advised the government that they did not forward the MIPR pages identifying the delivery schedule (finding 9). On that same day, MSgt Starnes responded confirming the established delivery date of July 7, 2018 (*id.*). Appellant acknowledged and immediately began production of the masks for delivery by July 7, 2018 (finding 10).

8

Accordingly, the elements of mutuality of intent to contract, and offer and acceptance have been met.

The parties' agreement is also supported by consideration. To be valid and enforceable, a contract must be supported by consideration to ensure mutuality of obligation. *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000). The consideration here is obvious and requires little discussion. Enviro Safety provided consideration by agreeing to manufacture and provide to the government the requested masks and components and agreed further to deliver the items by the desired delivery date. In exchange, the government promised to pay Enviro Safety the sum of $668,191.25 upon completion and delivery of the masks.

We now look to the last element of proof – actual authority on the part of the government representative to bind the government in contract. The government correctly highlights that "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins.*, 332 U.S. at 384. The reasons for this rule are clear. As observed in *City of El Centro*, 922 F.2d at 820, "[t]he United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." The government maintains that any action taken by SSgt Blythe, MSgt Starnes, or SSgt Wright, was an unauthorized action (gov't br. at 9). The burden is on the one seeking to bind the government to show the agent's authority. Unfortunately, it is unclear from the record whether any of the three individuals directly involved in the issuance of the MIPR had contracting authority. Conversely, we do know that SSgt Nguyen was a contract specialist and performed the contract review (finding 11). However, we cannot find any demonstration in the record that she possessed a warrant, and if so, whether the grant of her warrant was sufficient to cover the amount of this transaction. We will not speculate. Nonetheless, the inquiry does not end here. While apparent authority will not bind the government, actual authority may be implied from the facts and circumstances surrounding each transaction. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989).

Fortunately, we need not resolve whether Enviro Safety demonstrated by a preponderance of the evidence that implied actual authority existed because we conclude that a responsible CO ratified the unauthorized action that occurred on June 4, 2018. A CO may ratify an unauthorized contract action under certain circumstances. "Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority." *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (citing *Harbert/Lummus*, 142 F.3d at 1433-34), *cert. denied*, 525 U.S. 1177 (1999); *see United States v. Beebe*, 180 U.S. 343, 354 (1901) ("[R]atification

9

can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken.... Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them.").

Ratification generally requires that the superior official have authority to ratify, knowledge of the subordinate's unauthorized act, and then act to adopt the unauthorized action. *Reliable Disposal Co.*, ASBCA No. 40100, 91-2 BCA ¶ 23,895 at 119,717. Here, we have two COs that had the authority to act, and did. The government acknowledges that Maj Trevor Chambers and his replacement Lt Col Warren, who both served as Chief of the RCO, were both COs with authority to adopt the unauthorized action (finding 19). Each was fully aware of all the facts as evidenced by the string of email communication, the information contained in the Request for Approval of Unauthorized Commitment, and discussions with appellant (findings 12-19). Each of these COs took decisive action in taking control over the ultimate outcome of the contractual agreement between Enviro Safety and 3M. After providing assurances of payment to Enviro Safety, they stepped in, negotiated a resolution and left Enviro Safety to live with the consequences (findings 18-19). The record is devoid of any discussion, let alone proof that the CO took this action at the behest, and with full concurrence of Enviro Safety. The question remains whether Enviro Safety would have agreed with Maj Chambers' and/or Lt Col Warren's decision to negotiate directly with 3M for the return of the items had they realized the government would refuse to ratify the unauthorized action. Each CO took decisive action that we believe implicitly ratified the unauthorized action.

The government maintains that Maj Chambers first became aware of the UAC on or about June 20, 2018. After Enviro Safety's invoice was rejected by DFAS (finding 11), Enviro Safety was advised to stop all work, first by Mr. Smithey, Deputy Chief of the RCO, and then again by Maj Chambers (findings 13-14, 16). Assurances were made that the government would proceed with ratification of the unauthorized action consistent with FAR 1.602-3 – Ratification of Unauthorized Commitments (findings 17-18). We hold that Enviro Safety relied upon those representations (*see* findings 14, 16-17). Recognizing the large dollar amount and the requirement to obtain approval at a very high level for the UAC, Maj Chambers began discussions with Mr. Maly concerning the ability to return the items to 3M (finding 17). Mr. Maly shared with Maj Chambers that he was told by 3M that the items were not returnable (finding 15). Maj Chambers then pursued discussions directly with 3M in the hope of reducing the exposure to the government. Those discussions bore fruit as 3M agreed to take back the items subject to a restocking fee of $95,000 and ultimately, with the direct intervention of a second CO, produced even lower fees (findings 18-19).

Ironically, Lt Col Warren's finding of "no benefit" was the direct result of the government intervention in this contractual relationship between Enviro Safety and 3M

10

that led to a return of the products to 3M, and the imposition of a restocking fee (finding 21). If there is no benefit, it is because the government took the benefit away through its negotiations. In reality, the benefit received by the government was the reduction in its exposure for the UAC. The government must now accept the costs associated with its actions.

If the ratifying official has actual or constructive knowledge of a representative's unauthorized act and expressly or impliedly adopts the act, ratification will be found. *Reliable Disposal*, 91-2 BCA ¶ 23,895 at 119,717. Here, we find that the government's actions to intervene and negotiate directly with 3M for the return of the items that were the benefit to the government resulted in an implicit ratification of the UAC. As a result, there is a valid contract between appellant and the government.[3]

Having determined that there was a ratification of the unauthorized commitment for the purchase of the masks and their components, we turn to Enviro Safety's claim for damages in the amount of $57,536.10 plus applicable interest and attorney fees.[4] Under the *Christian* Doctrine, we incorporate the standard termination for convenience clause, FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE), into the parties' ratified contract. *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963); *ASFA Constr. Industry and Trade, Inc.*, ASBCA No. 57269, 15-1 BCA ¶ 36,034 at 176,006-07 *accord Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147, 152 (2005) ("As with any government contract, express or implied, the government enjoys the ability to terminate a contract for its convenience, absent bad faith on the part of the government."). FAR 52.249-2(a) provides that the government "may terminate performance of work under this contract...if the Contracting Officer determines that a termination is in the Government's interest." Under the parties' ratified contract, the government directed Enviro Safety to stop all work (findings 13-14, 16). These communications constructively terminated the ratified contract for the convenience of the government. Having paid the restocking fee of $57,536.10, appellant is entitled to be reimbursed for those damages (finding 20).

---

[3] Having found that a CO with authority ratified the unauthorized actions, we do not need to explore appellant's arguments related to "institutional ratification."

[4] Appellant's request for attorney's fees at the complaint stage of the proceedings (compl. at 13) was premature and thus not properly before the Board. *Maintenance Engineers, Inc.*, ASBCA No. 34431, 87-2 BCA ¶ 19,915 at 100,744; *J.M.T. Machine Co.*, ASBCA No. 23928 *et al.*, 86-2 BCA ¶ 18,928 at 95,512, *aff'd*, 826 F.2d 1042 (Fed. Cir. 1987). The Equal Access to Justice Act (EAJA), 5 U.S.C. § 504(a)(2), provides, in pertinent part, that "[a] party seeking an award of fees and other expenses shall, within thirty days of a final disposition in the adversary adjudication, submit to the agency an application which shows that the party is a prevailing party and is eligible to receive an award under this section."

11

## CONCLUSION

The appeal is sustained. Accordingly, Enviro Safety is entitled to recover its claimed costs of $57,536.10 plus CDA interest from October 31, 2018, until paid.

Dated: May 8, 2019

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61932, Appeal of Guardian Safety & Supply LLC d/b/a Enviro Safety Products, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12